State v. Barutio.

THE STATE v. BARUTIO, Appellant.

Division Two, February 21, 1899.

Manslaughter: THIRD DEGREE: INSTRUCTIONS. An instruction, under Revised Statutes 1889, section 3471, declaring the killing of another in a heat of passion, "without a design to affect death," to be manslaughter in the third degree, is not called for, where defendant, worsted in a quarrel of his own seeking, in which he was the manifest aggressor, rose with the exclamation, "I will fix him anyhow!" went to his house, got a revolver, returned making threats, shot towards the window from which he heard deceased promise his mother he would not fight, and, on hearing a scream exclaimed, "I got him anyhow," and, when taken to his bed, said he was sorry he had not killed him. In such circumstances, no instruction should have been given on any grade of homicide but murder in the first degree.

*Appeal from St. Louis City Circuit Court.*—HON. P. R. FLITCRAFT, Judge.

AFFIRMED.

CHAS. P. JOHNSON, W. F. FITZGERALD and CHARLES T. NOLAND for appellant.

(1)   The court should have instructed the jury upon the third degree of manslaughter, as defined in section 3471, Revised Statutes 1889. There was evidence to· sustain the theory that Barutio, in a heat of passion produced by blows upon his face, without a design to effect death, fired his pistol (a dangerous weapon) toward a window, the shutters of which were closed, and, although not so intended, the result was the killing of Henry Becker. It was reversible error for the trial court to fail to instruct upon such theory of the case and the law governing it. State v. Talmage, 107 Mo. 569; State v. Wilson, 98 Mo. 449; State v. Elliott, 98 Mo. 150; State v. Gassert, 65 Mo. 352; State v. McKinzie, 102 Mo. 620; State

v. Thomas, 78 Mo. 327. (2) It was error for the trial court
to fail to instruct the jury as to manslaughter in the fourth
degree as defined by section 3477, Revised Statutes 1889,
inasmuch as there was evidence to sustain the theory that
Barutio, in a heat of passion engendered by blows inflicted by
Becker, procured a pistol and flourished it around in a reck-
less, dangerous and culpably negligent manner, and while so
doing it was discharged, and Becker accidentally shot, from
which wound he afterwards died. State v. Grote, 109 Mo.
345; State v. Morrison, 104 Mo. 638; State v. Henson, 106
Mo. 66; State v. Emery, 78 Mo. 77. (3) The sixth instruction
given by the court is erroneous. It limits the jury, in deter-
mining whether a heat of passion aroused by blows has or has
not passed away, to a question simply of "time." It tells the
jury that even if a heat of passion was aroused by the blows
yet if "there was sufficient time for the blood to cool before
the shooting was done, then the offense is not manslaughter,
but murder." State v. Grugin, 147 Mo. 39; Hurst v. State,
46 S. W. Rep. 635; State v. Woods, 97 Mo. 31; 1 Wharton,
Crim. Law (9 Ed.), sec. 480; Wharton on Hom., sec. 449;
Hurd v. People, 25 Mich. 405; State v. Moore, 69 N. C. 267.

EDWARD C. CROW, Attorney-General, and SAM B. JEF-
FRIES, Assistant Attorney-General, for the State.

(1) The only questions raised by the defendant in his
brief have reference solely to the instructions given by the
court. In this regard the court instructed the jury upon the
question of murder in the first and second degrees and man-
slaughter in the fourth degree. The first proposition submit-
ted, is that the court should have instructed upon manslaughter
in the third degree as defined by section 3471, Revised Stat-
utes 1889. Now it has been heretofore held by this court
that by the plain provisions of this statute there can be no such
thing as manslaughter in the third degree when the killing is

intentional.    State v. Pettit, 119 Mo. 410.    (2)    While the court instructed the jury upon the question of manslaughter in the fourth degree, yet it is insisted upon by the defense that an instruction should have been given upon this degree as defined by section 3477 inasmuch as there was evidence to sustain the theory that the defendant, in a heat of passion engendered by blows inflicted by the deceased, procured a pistol, flourished it around in a reckless, dangerous and culpably negligent manner and while so doing it was discharged and Becker accidently shot from which wound he afterward died.    In this particular we are unable to discover error for the reason that there is no evidence showing a negligent and reckless use of the deadly weapon, nor does it appear that there was an effort made upon the part of the defendant during the trial of the case to show that the act was committed accidentally.    While the authorities submitted upon this proposition by defendant are well and good, yet they are not applicable to this case for the reason that defendant can not escape the natural and inevitable conclusion of the evidence and the effect which it must necessarily have had upon the judgment of the trial court in granting the instruction and of the jury in passing upon his guilt or innocence.    It is true that when a defendant under the influence of a violent passion, with no intent to kill, draws a revolver and it is discharged, resulting in the killing of a person, it is manslaughter in the fourth degree.    But the evidence here shows that the firing of the pistol was done with an intent to kill.    The admitted fact upon the part of defendant's witnesses that defendant stood by the window and held his revolver, pointing towards it for a few minutes before he fired, is a matter that can not be disregarded by this court nor could it have been disregarded by the trial court or the jury in passing upon the issues involved and it is to be looked upon and considered as an index to defendant's actions during the conflict.    The whole line of testimony shows a design and an intent upon

the part of the defendant to take the life of the deceased. To make out a case of manslaughter in the fourth degree from culpable negligence in handling a pistol, as defined by section 3477, it must be shown that the killing was accidental, and that the defendant was guilty of culpable negligence. State v. Henson, 106 Mo. 66; State v. Morrison, 104 Mo. 638; State v. Emery, 78 Mo. 77.

SHERWOOD, J.—Convicted of murder in the second degree and his punishment assessed at ten years in the penitentiary, and this under an indictment for murder in the first degree, defendant appeals to this court. Henry Becker, whose nick, or pet name was "Hense," was the victim of the fatal shot fired by defendant. On this last cited fact there is no dispute, nor is there any plea of self-defense in the case, nor any evidence to sustain such plea; so that the sole question presented to the lower court to try was the grade of homicide of which defendant should be found guilty.

The circumstances attendant on the homicide were in substance these: The defendant lived in the city of St. Louis on Gyer avenue, between Third and Fourth streets. Henry Becker lived with his mother and brother on Gyer avenue, across the alley from defendant's home. On the seventeenth day of August, 1896, Henry Becker, Peter Opperman, Oscar Kuring, Paul Marty, Otto Wagner, George Humelson and Johnnie Becker were sitting in the alley which passed between the premises of the defendant and the home of deceased's mother. This was between 7 and 8 o'clock in the evening. They had been sitting there about fifteen minutes engaged in conversation about hauling coke. Peter Opperman had just made the remark that he could unload a car of coke in a day, when the defendant came through the alley from his stable near by and said to Opperman: "You've got a big mouth about work.' To this Opperman replied, "I have when I get paid for it."

Defendant then stepped up to Henry Becker, to whom he had not spoken for two years, and said to him, "Do I owe you anything?" When the latter replied, "Not a cent." The defendant then asked, "Who do I owe anything to," and Becker answered, "Oscar Kuring you owe half a day." The defendant thereupon started toward Henry Becker, striking him on the head while he was sitting down, and he thereupon got up and stood for a few minutes guarding himself against the blows of the defendant. He finally knocked defendant down, who fell between a team of horses which belonged to the defendant and which were tied to a wagon near by. The defendant's sister-in-law came upon the scene of action and assisted him in getting up and as he was going towards his house he passed Henry Becker and said, "I will fix him, anyhow." Henry Becker stood on the sidewalk for about ten minutes; but meanwhile defendant having gone down to his house, some eighty feet distant, got his revolver and coming through his stable which sat upon an alley, he advanced up the alley towards the scene of the recent fight, where the parties were still in the alley and close to the house where Henry Becker's mother lived. Mrs. Becker aware that there had been a bout between her son Henry and defendant, and hearing defendant come cursing up the alley, and saying that he was "going to kill the black son of a b——," she called Henry who, but a few feet away, came at his mother's call, entered the house and slammed the door after him. Meanwile defendant came on up the alley to where Pete Opperman was sitting in a chair leaning up against Mrs. Becker's house, and thrusting his revolver into Opperman's face said, "Where is that black son of a ——?" This question defendant repeated for three or four minutes. Opperman made no reply. It was then about 7:30 o'clock and a lamp had been lit in the front room, but had been moved into an adjoining room and the door being open the light shone through into the front room. The window in that room was raised, and the shutters closed, but a slat

had broken and slipped down a little on the south shutter. Facing that open window and closed shutters, Henry Becker and his mother stood; at this juncture, defendant having ceased his passionate interrogations to Opperman, and being close by the shutters mentioned, Henry Becker was heard to say, seemingly to his mother, "I won't fight for your sake," when defendant saying, "I will get the black son of a b—— anyhow," sprang towards the shutters and fired. Immediately an outcry as if from a person in great agony was heard in the house and from behind the shutters, and defendant exclaiming, "I got him anyhow," turned and walked down the alley towards his home. The ball fired by defendant passed through the south shutter (the one on which the slat had slipped down) making a hole therein and entered Becker's right eye destroying that organ, and passing on lodged in the muscles of the face immediately in front of the right ear, and resulted in Becker's death on the second day of September, 1896. Within about two hours after Becker was shot, defendant was brought to Becker's bedside by two policemen for the purpose of identification. Becker's mother sat by him on the bed. Being asked by the policeman "Is this the man that shot you?" Becker replied, "Yes, that is Frank Barutio that shot me." Whereupon defendant said: "I am sorry I did not kill the black son of a b——."

The court instructed on murder in the first and second degrees, and manslaughter in the fourth degree. These instructions follow stereotyped formulae as to these degrees of homicidal crime, and the instruction relating to manslaughter left it to the jury to say whether defendant at the time of the shooting, was under the influence of hot blood, produced by the blows given him by Becker, and whether sufficient time had elapsed for the blood to cool, etc. The objections raised by defendant in this court point solely to some of the instructions given by the trial court.

It is asserted that that court should have instructed upon

State v. Barutio.

manslaughter in the third degree as defined by section 3471, Revised Statutes 1889. That section declares: "The killing of another in a heat of passion without a design to effect death, by a dangerous weapon, in any case except such wherein the killing of another is justifiable or excusable, shall be deemed manslaughter in the third degree." There was no basis on which to found such an instruction. All of the testimony, both on the part of the State and defendant, shows that defendant hàd "a design to effect death." Worsted in a quarrel of his own seeking, in which he was the manifest aggressor, he rises from the ground, exclaiming, "I will fix him anyhow;" goes to his house, procures his revolver, comes up the alley, "breathing out threatenings and slaughter," inquires for Becker, and as soon as he heard him speak the promise to his mother, "I won't fight for your sake," he springs towards the window from whence the sound proceeds, saying, "I will get the black son of a b——, anyhow," fires the fatal shot and when an agonized shriek is heard in response to that shot, boastfully exclaims, "I got him, anyhow!" Not content with this exhibition of mortal hatred and malice, defendant two hours afterwards, when taken to the bedside of his fatally wounded victim, said in the presence of that victim's mother, who sat on the bed beside him, "I am sorry I did not kill the black son of a b——."

It is difficult to conceive of conduct more strongly expressive of the inner workings of "a heart regardless of social duty and fatally bent on mischief." In short, if defendant's words and their accompanying acts do not indicate express malice, do not proclaim a most cowardly and brutal murder, then our legal lexicographers will soon have to formulate a genesis of new definitions. The State v. Talmage, 107 Mo. 543, insofar as it gives support to defendant's contention respecting section 3471 aforesaid, has been expressly overruled by State v. Pettit, 119 Mo. 410.

The like line of remark is applicable to defendant's second

Seehorn v. Bank.

contention in regard to section 3477, Revised Statutes 1889, which treats of manslaughter in the fourth degree; there are no facts in evidence which would warrant an instruction based on that section. The evidence has no tendency to show a reckless or culpably negligent discharge of defendant's pistol such as is illustrated by the case of State v. Emery, 78 Mo. 77, and similar cases, but a deliberate discharge of that weapon in order to carry out the fell purpose defendant had predetermined. It is true an instruction was given upon manslaughter, but in my opinion no instruction should have been given for any lower grade than murder in the first degree.

Defendant really established, by the facts in evidence, no more right to an instruction on manslaughter, than to instructions on self-defense, alibi or insanity. These views eliminate from consideration the sixth instruction which is asserted to be erroneous. But if an instruction in regard to "cooling time," "hot blood," etc., should have been given at all, the one given meets the requirements of our latest ruling on that subject. [State v. Grugin, 147 Mo. 39.]

Consequent upon the views aforesaid, judgment affirmed. All concur.