## THE STATE v. VINSO, Appellant.

### Division Two, February 3, 1903.

1. **Information: AMENDMENT.** An information under our Constitution, which makes prosecution by indictment or information concurrent remedies, means the common-law information, and in the absence of statutory provisions to the contrary the common-law practice prevails, and as amendments to informations were allowable at common law, so they are under our present Constitution and statutes.

2. ———: ———: FILING NEW INFORMATION: NOTICE. Such amendment may be made by filing an entirely new information. Nor is it necessary for the prosecuting attorney to give notice in advance of his intention to file such new information, since a copy thereof must be served on defendant before trial. So that, where the prosecuting attorney filed an information charging murder, and the cause

was continued to the next term, he had a right at that term to file a new information charging murder, and proceed to trial thereunder.

3. **Homicide**: SUBSEQUENT QUARREL: RES GESTAE. Evidence that as soon as defendant had committed the homicide certain bystanders undertook to close in around him, whereupon he drew his knife and thus cleared the way to escape, is competent as a part of the *res gestae.*

4. ———: REVENGE: DELIBERATION. A homicide committed for revenge is deliberate.

5. ———: MURDEROUS PURPOSE. Where the defendant's murderous purpose to draw some one into a dispute with him and then strike him down with a hidden weapon, is made apparent from the facts and circumstances, they furnish ample grounds for the jury to find that the homicide was deliberate and premeditated.

6. ———: DELIBERATION: CASE STATED. Deceased was standing at a public railroad station awaiting the arrival of a train upon which he expected to take passage. While quietly chatting with a brother and other friends, defendant appeared with a rock in his right hand hidden under his coat, and without any cause or provocation from any of them began to boast of his ability to whip any person on the platform, coupling the boast with the vilest epithets. None of the party noticed his threat and he passed by, but returning he repeated the threat, whereupon, without anger or excitement, deceased said to him, "Pard, you might get whipped for saying such things as that," and turned so that his side was towards defendant, and then defendant drew the rock from under his coat and crushed the skull of deceased. Then he drew his knife and made a way through the bystanders for escape. Defendant testified that he selected the deadly missile some distance from the station, and when he reached the station he thought deceased was one of three persons with whom he had had an altercation previously in the day, and that he concluded he would bluff him. *Held, first,* that the purpose defendant had in view in going to the station must be judged from his acts and contemporaneous expressions; *second,* it is no palliation of defendant's conduct that he had not previously known deceased and, hence, could have had no motive for killing him; *third,* defendant's acts show premeditation and deliberation.

7. ———: ———: QUARREL WITH ANOTHER: PALLIATION. A defendant can not embroil himself in a controversy with one man and when that is over kill another unsuspecting and unoffending citizen who was no party to the quarrel, and his violent passion and excited state of mind engendered by such quarrel are no palliation for a murderous assault upon such other.

Vol 171 mo—37.

8. ———: MANSLAUGHTER IN THIRD DEGREE: INTENTIONAL HOMICIDE. Manslaughter in the third degree and intentional homicide do not go together. Where the homicide is intentional an instruction on manslaughter in the third degree should be refused.

9. **Instructions on Manslaughter:** NO REQUEST: NO EXCEPTION. Where defendant neither asked an instruction on manslaughter in the third or fourth degree, nor prayed the court to instruct on all the law of the case, nor saved any exception to its failure to do so, the point that the court should have instructed on both degrees of manslaughter can not be presented to the appellate court for review.

10. **Instructions Whether Requested or Not:** NO EXCEPTIONS. The statute which requires the court to instruct upon all questions of law in the case, whether requested or not, does not relieve against the rule which requires objections and exceptions to be saved to errors of the trial court, and unless such exceptions to the court's failure to fully instruct are saved, the point is not open for review on appeal.

11. ———: DECLARATORY OF THE LAW. Such statute (sec. 2627, R. S. 1899) is simply declaratory of the law as it had long previously existed in this State.

Appeal from Lawrence Circuit Court.—*Hon. H. C. Pepper*, Judge.

AFFIRMED.

*Adiel Sherwood* and *Joseph S. McIntyre* for appellant.

(1) The verdict was against the evidence and the weight of the evidence. Where the evidence is preserved in the bill of exceptions, the appellate court will inquire whether the verdict is against the evidence. State v. Fritterer, 65 Mo. 422; State v. Clarkson, 96 Mo. 364. (2) The constitutional amendment authorizing the prosecution of felonies upon information does not authorize an amended information which would be bad, even with defendant's consent, and the amendment is certainly error without notice to defendant and opportunity to be heard and without leave of court. The motion to quash should have been sustained. At common law, informations could be used only in the prose-

cution of misdemeanors. The statute of amendment
and jeofails did not apply to criminal proceedings. 1
Bacon's Abr., Amendment and Jeofail, title C. We
have no statute authorizing amendments which applies
to felonies prosecuted upon information. Such a statute
could not change the common-law rule, because the in-
formation provided for in the amendment of 1900, is
the common-law information. State v. Russell, 88 Mo.
648; Com. v. Maher, 12 Pick. (Mass.) 120; People v.
Campbell, 4 Parker Crim. Rep. (N. Y.) 386; Com. v.
Adams, 92 Ky. 134, 17 S. W. 276. At common law the
information could not be amended, except upon leave
of court. 1 Bishop, New Crim. Pro. (4 Ed.), sec. 714;
Rex v. Wilkes, 4 Burr. 2569; King v. Goffe, 1 Lev. 189;
Anon., 1 Salk. 150; State v. White, 64 Vt. 372. And
after notice to defendant. King v. Goffe, 1 Lev. 189.
Which practice is followed in Missouri in prosecutions
for misdemeanors upon information. State v. Bragg,
63 Mo. App. 27; George v. Middaugh, 62 Mo. 551. Cer-
tainly if an amendment of an information for a misde-
meanor can not be made without a statute (such as we
have) authorizing the same and even then notice and
opportunity to be heard and leave of court are essential,
an amendment of an information for the commission
of a felony can not be amended without notice and with-
out leave—when there is no statute. (3) There was
no evidence of deliberation and the court should have so
instructed the jury. All the evidence in the case goes
to show that defendant was in a violent passion, excited
state of mind and a hot condition of blood at the time
the rock was thrown; laboring under these conditions
it was impossible for plaintiff to have been in a cool
state of blood, and since the evidence shows that plain-
tiff threw the rock under great excitement, violent pas-
sion, extreme fear and mutual combat, the court should
have instructed the jury that the element of deliberation
was not present. It was incumbent on the State to show
both premeditation and malice. State v. Crawford, 115
Mo. 630; State v. Rose, 142 Mo. 425. (4) Even though
deceased did not participate in the previous encounter

between defendant and Tate, testimony relating to such encounter was admissible and competent for the purpose of showing that defendant was not in cool state of blood. Where two persons, upon a sudden quarrel, engage in mutual combat and one of them is killed in the heat of passion, the offense is at least manslaughter. State v. Davidson, 95 Mo. 155; State v. Dieckman, 11 Mo. App. 538, 75 Mo. 570. (5) Defendant was entitled to instructions on manslaughter in both the third and fourth degrees. Where, upon a trial for murder, there is evidence given tending to show that deceased used personal violence towards the accused, the court should, by proper instructions, define the crime of manslaughter as well as murder and excusable homicide, though the defense fails to ask such instruction. State v. Branstetter, 65 Mo. 149; State v. Petit, 119 Mo. 410; State v. Talmage, 107 Mo. 543; State v. Curtis, 70 Mo. 594; 2 Bishop's New Cr. Law, sec. 701. Passion aroused by provoking words alone, accompanied by an attempt to take life, is manslaughter under our statute. State v. Berkley, 109 Mo. 665; State v. Elliott, 98 Mo. 150; State v. Wilson, 98 Mo. 440; State v. Goddard, 146 Mo. 180; State v. Partlow, 90 Mo. 616. Defendant may be guilty of manslaughter in the fourth degree even though he intended to kill; if he acted without malice and in the heat of passion and not in self-defense, he is guilty of manslaughter in the fourth degree, even though he willfully killed deceased. State v. McKinzie, 102 Mo. 632; State v. Brown, 104 Mo. 373; State v. Talmage, 107 Mo. 570.

*Edward C. Crow*, Attorney-General and *C. D. Corum* for the State.

(1) The information is sufficient. State v. Worton, 139 Mo. 532. (2) The appellant's first complaint arises because the court permitted the prosecuting attorney to file an amended information. The objection and exception must be bottomed on the ground that an amended information can not be filed under any circum-

stances. But the law is otherwise. In filing informations for felonies, the prosecuting attorneys of this State are governed by the rules of the common law. State v. Kyle, 166 Mo. 287; Hughes' Criminal Law and Practice, sec. 2776; 1 Bishop's Criminal Practice (2 Ed.), sec. 1215. (3) It will be seen that the State, over the objection of the defendant, was permitted to prove that immediately after the defendant had assaulted Ward, he also attempted to strike Kelley with a knife. This evidence was competent as a part of the *res gestae*. This was the only objection to any testimony in the case. State v. Matthews, 98 Mo. 125; State v. Sanders, 76 Mo. 35. (4) No motive for this murder was apparent. But the defendant should not be acquitted for that reason. It is not incumbent on the State to show the motive for the commission of murder. State v. Foley, 144 Mo. 620; State v. David, 131 Mo. 380. (5) The "defendant requested the court to declare the law to be that if defendant killed deceased while in a heat of passion, the jury could not convict of murder in the first degree, although the jury believed defendant did not believe or have good reason to believe that deceased was present at the difficulty at the bridge." This request must have been made upon the theory that if defendant was in a violent passion from any cause, or without cause, at the time he killed deceased, he was guilty of no greater crime than manslaughter. The evidence in this case, in our opinion, makes out a case of murder in the first degree. The deceased said nothing to arouse the passions of the defendant. He did nothing. He was unoffending. The annals of criminal jurisprudence do not furnish a more astounding example of a brutal and causeless murder. There does not appear to be a single palliating circumstance. The defendant's mission was murder. He addressed witness Ellis in the most insulting language and applied to him the epithet most calculated to offend and produce trouble. The remarks were wholly uncalled for. If man ever had a "heart regardless of social duty and fatally bent on mischief," such heart must beat in the breast

of defendant.   It seems incredible to believe that a sane person could be guilty of such atrocity.   There was no lawful or other provocation for the deed.   His passion was not suddenly aroused.   The court did not err in failing to instruct on manslaughter.   State v. Crawford, 115 Mo. 620; State v. Barutio, 148 Mo. 249; State v. Kloss, 117 Mo. 591; State v. Lewis, 118 Mo. 79; State v. Swannagun, 109 Mo. 233.   The instructions fully covered the case, and if they had not, the attention of the trial court was not directed to such omission and the point can not be first raised here.   State v. Albright, 144 Mo. 642.

GANTT, P. J.—At the March term, 1902, of the Lawrence Circuit Court, the prosecuting attorney of said county filed an information charging the defendant, John Vinso, with murder in the first degree, of William Walter Ward, at said county on October 13, 1901.

On October 23, 1901, the defendant had been committed on his preliminary examination to await the action of the circuit court, and on October 26, 1901, the prosecuting attorney filed an information in the clerk's office, charging the defendant with murder, and at the November term, 1901, defendant was duly arraigned thereon, and the cause on defendant's application was continued to the March term, 1902.

At the March term, 1902, the prosecuting attorney, by leave of the court, filed the new information on which defendant was tried and convicted.   As this information is in all respects sufficient, it is not deemed necessary to copy it in this statement.

The defendant filed his motion to quash this information on the ground that it was filed without warrant or authority of law, which motion was overruled, and defendant saved his exception.   The defendant was then duly arraigned on said second information.

The testimony discloses that William Walter Ward was a young man about twenty-four years old.   He was a switchman on a railroad at Dallas, Texas, at the time he was killed by defendant, but had been to Missouri on

a visit to his father and mother, who resided at or near Monett. It appears that he came from Texas about Thursday or Friday preceding his death on Sunday, October 13, 1901. He had come to Pierce City that day, between one and two o'clock, to visit his brother. He went up into the city and was gone about thirty minutes, and the remainder of the time he spent with his brother at his house and then walked over with him to the station to return to Monett. A short time after deceased reached the depot and while talking to his brother, Harry Kirk and others, the defendant came walking to the station from the east. A freight train soon ran into the station on the main track, headed east. The defendant walked along by the train with his right hand under his coat. As he walked by the deceased and his companions, he said, "I can whip any G—d d—n son of b—h on the platform," and one of the party remarked to Mr. Kirk, "Kirk, he means that for you." Defendant walked on, turned, and came back by the crowd, repeating the challenge, and deceased said, "You didn't mean that for me?" The defendant answered, "Any d—n s—n of b—h." Deceased then asked him, "What have you got under your coat?" and defendant said, "I have got a 44 and can use it," and with that he stepped back and threw a rock, which struck William W. Ward, the deceased, on the side of the head, crushing the skull, and inflicting a wound from which he died the next morning, about 3 o'clock. He was never conscious after receiving the wound from the rock.

Immediately after throwing the rock at Ward defendant was surrounded by the bystanders, when he drew a knife and forced his way out and fled. At the time Ward received the fatal wound he was standing with his hands in his pockets, and according to the great weight of evidence was making no demonstration of violence toward defendant.

Defendant testified in his own behalf. According to his story, something like three-quarters of an hour prior to the homicide he met his uncle, George Tate, the deceased Ward, and another man, and his

uncle said he believed he would whip defendant just for fun, and deceased said to Tate, ''Go get him;'' that he backed off and finally his mother got between them and took defendant home. He had never seen Ward, the deceased before. He says he was afraid Tate would thrash him, as he had done once before, about a year prior to this time, and concluded he would take the first train out of Pierce City for Newton, Kansas, where he had a brother living. He went over to the station to take a train west, and as he went, he got the rock with which he afterwards killed Ward. He came up on the station, saw Ward standing talking to his crowd, and concluded he would run a bluff on him; ''thought he wouldn't jump on me. I said I was the best man in town. No one made any reply at first, but after a little Ward said, 'I can whip three like you,' and I made him no answer. And then deceased said, 'I used to whip two or three like you before breakfast,' and I said, 'You never did whip a man like me,' and he said, 'I'll show you,' and started towards me, and I had a rock and he stepped two or three steps towards me, and I throwed at him, and didn't know whether I hit him or not. . . . I was scared of him because I had seen him with Tate and the other fellow, and I didn't know whether he had a gun or not.''

Waters, one of the two men who were with Tate that afternoon, testified that a man by the name of Forbes was the third man with them, and not the deceased, and that Tate instead of seeking a fight with defendant, took him home to keep him out of a fight with some other young men.

George Tate also testified that Forbes was the third man in his party that afternoon when the wordy altercation with defendant took place, and not Ward, the deceased. Indeed, the evidence is conclusive that the deceased had nothing to do with the brawl between defendant and his uncle, George Tate, and that that difficulty had nothing to do with the homicide.

Other facts may be noted if necessary.

I.   The right of the prosecuting attorney to file a new information is challenged.

If this prosecution had been by indictment and the first indictment quashed on the motion of the prosecuting attorney, or defendant, for some defect, no doubt can be entertained that the same grand jury, if still in session, or a subsequent grand jury, might have preferred a new indictment, for such has been the unvarying rule wherever the common law obtains.

Equally well settled is the rule that a grand jury may prefer a second indictment while the first is still pending, and the pendency of the first, unquashed by any formal  order of the court, is no ground for abatement or bar to further prosecution. [State v. Eaton, 75 Mo. 589; State v. Goddard, 162 Mo. 223; State v. Melvin, 166 Mo. 571; 1 Chitty's Crim. Law, 477; Wharton's Crim. Pl. and Pr., sec. 452.]

Under section 12 of article 2 of our Coustitution as amended in 1900, ''prosecutions for felony may be either by indictment *or information, as concurrent remedies.''*   If, as it is everywhere ruled, a new indictment may be preferred, pending another, and even after arraignment, and issue joined, what principle of proper procedure would deny the right of the prosecuting attorney to file a new information?   As said in Kalloch v. Superior Court, 56 Cal. loc. cit. 236:   ''Each is but an accusation, in legal form, of the offense with which the prisoner stands charged, and for which he is to be placed on trial.''   No privilege of the prisoner is taken away.   He is entitled to a copy of the information before he pleads and every constitutional guarantee is vouchsafed to him that he would have in case of a new indictment preferred had the proceeding originally been by indictment.   In neither is he entitled to notice of the intention to prefer a new indictment, nor to file a new information.

While the point was not raised in the recent case of State v. E. Russell Bartlett, 170 Mo. 658, decided December 16, 1902, it was in effect held by SHERWOOD, J., *arguendo,* that the prosecuting attorney could not file

a new information in a county other than that in which
the offense was committed when a change of venue had
been granted, but it was said that a new indictment could
only be preferred in the county where the crime was
charged to have been perpetrated, so likewise the prose-
cuting attorney was limited in his right to file a new
or amended information to the original county, but that
he could *proceed by a new* information was clearly con-
ceded. At common law the right to amend, even after
plea pleaded, was well settled.

In King v. Harris et al., 1 Salkeld 47, Ch. J. HOLT
in a perjury case said: "As to mending after plea
pleaded there is no great matter in that; after a record
has been sealed up, I have known it amended, even just
as it was going to be tried."

In Rex v. Wilkes, 4 Burr. 2527, all the precedents
as to the amendment of informations was brought un-
der review by Lord MANSFIELD, and the conclusion
reached that at common law an information was
amendable. In the course of his opinion he asks, "And
why should it not be amended? If it had not been
amended, the Attorney-General would have dropped
this information, if he thought there was a slip in it,
and have brought another. And this would have been
more inconvenient to the defendant, and have harassed
him more; he would have no benefit, and more vexation.
This amendment avoids delay, and saves expenses.
. . . There is a great difference between amending
indictments and amending informations. Indictments
are found upon the oaths of a jury; and ought only to
be amended by themselves; but informations are as
declarations in the King's suit. An officer of the crown
has the right of framing them originally; and may, with
leave, amend in like manner as any plaintiff may do."

Now, it is obvious from the whole context of his
opinion that Lord MANSFIELD recognized two methods
of procedure by the crown officer. He could elect to
file an entirely new information, or he could ask leave
of the court to amend by interlineation or erasure, the
information already filed, and of course in the latter

case, especially after issue joined, notice should be given defendant of the amendment. In this case the prosecuting attorney had elected to file an entirely new information, and we have no doubt whatever of his right so to do, or of the propriety of the decision overruling the motion to quash, based on the ground that it was not allowable to amend an information. In State v. Kyle, 166 Mo. 287, we held that "information," as used in our Constitution, means the common-law information, and in the absence of statutory provisions to the contrary, the common-law practice prevails, and we have seen amendments proper were allowed at common law as a matter of course at any time before trial. [State v. White, 64 Vt. 372.]

II. In the brief of counsel it is urged that incompetent evidence was admitted on behalf of the State as to a "difficulty between defendant and one Williams, subsequent to the difficulty with deceased." There is testimony in the record of a quarrel with a young man named Williams prior to the homicide, which George Tate stopped by taking defendant home. If this was the evidence no objection or exception was taken to it. If, however, counsel refers to what occurred between defendant and Kelley when Kelley and others attempted to apprehend defendant immediately after he had struck deceased, we are clear no error was committed. It was a part of the *res gestae* and admissible as evidence of his effort to escape. The evidence simply was that as soon as he had knocked Ward down, the bystanders, Kelley and others, started to close in around defendant, and he drew his knife, and thus cleared his way, and ran away.

III. The position is advanced that there is no evidence of murder in the first degree; in a word, "no deliberation."

In State v. Fairlamb, 121 Mo. loc. cit. 144, it was said: "It is not necessary under our statute in order to constitute murder in the first degree that the murder should be committed by means of poison, or by lying in wait, or that it shall be committed in the perpetration

or attempt to perpetrate arson, rape, robbery, burglary, or mayhem, but any kind of willful, deliberate and premeditating killing is murder in the first degree." [State. v. Chas. Ellis, 74 Mo. 207.]

What are the substantial facts?

An unoffending citizen is standing at a public railroad station awaiting the arrival of a train on which he expects to take passage. He is quietly chatting with a brother and other friends. At this juncture the defendant appears on the scene with a rock in his right hand and hidden under his coat, and without the slightest cause or provocation from anyone he begins to boast of his ability to whip any person on the platform, coupling the challenge with vile epithets. None of the party notice his challenge and he passes by. Returning to where they stood he again announced his ability to whip any one on the platform, whereupon Ward, the deceased, remarks to him, "You don't mean that for me?" and defendant replied that he meant it for "any d—n s—n of a b—h," whereupon without anger or excitement deceased said to him, "Pard, you might get whipped for saying such things as that," and turned so that his side was toward defendant, and thereupon defendant, without more, drew the rock from under his coat and hurled it at deceased, striking him on the side of the head, crushing the skull and driving the bone into the brain and inflicting a necessarily fatal wound, from which Ward next morning died. Defendant then drew his knife to make his way clear and fled. The rock was a deadly missile and had been secreted in his hand under his coat until he threw it with murderous force at deceased, who was standing with his hands in his pockets at the time.

The defendant testified that he selected this stone some distance from the station and when he reached the station he thought Ward was one of the three persons with whom he had had an altercation that afternoon before coming to the depot, and he concluded he would bluff him. He admits, however, that deceased paid no attention to him, and was making no demonstra-

tion toward assaulting him, and that he began to use the vile and insulting challenges until he evoked the caution which deceased gave him as to such conduct. We have then a man arming himself with a deadly weapon, going into a peaceable crowd at a public station and without either just provocation growing out of any degrading or insulting epithets, or reasonable or lawful provocation caused by a blow or slap or other personal indignity, striking down one who had merely advised him against the folly of his conduct. That defendant had ample time to fully form the intention to kill Ward, and that he was not acting under a violent passion suddenly aroused by any just, lawful or reasonable provocation, is too clear for discussion. That his act was also premeditated and deliberate we think the facts clearly establish. By his acts and contemporaneous expressions we must judge his purpose. It is no palliation of his conduct that he had not previously known deceased and hence could have had no motive for killing him rather than some other person.

He evidently came to the station seeking an opportunity to vent his malice upon some one, and upon the baseless pretext that he thought deceased was one of the men who was with George Tate with whom he had had a quarrel that afternoon, he struck him down when deceased was making no effort to renew that quarrel, and making no show of violence. These facts demonstrate that he killed him for revenge, which would bring it clearly within all the definitions of deliberation.

If, on the other hand, deceased was not with Tate and Waters, as the facts fully establish, but out of the very malignity of his heart, he slew him without any provocation given by deceased, and had time to fully form the design to kill him, then he is equally guilty of a willful, deliberate and premeditated murder.

The law does not require that he should have brooded over the matter for a week or an hour. As said by Judge King in Com. v. Daley, 4 Penn. L. J. 157: "No specific length of time is required for such deliberation. It would be a most difficult task for human wit

to furnish any safe standard in this particular. Every case must rest on its own circumstances. The law, reason and common sense unite in declaring that an apparently instantaneous act may be accompanied with such circumstances as to leave no doubt of its being the result of premeditation.''

''The true view,'' says Wharton, in his work on Homicide, section 180, ''is that 'intent' and 'deliberation' are to be inferred from facts; that they are not to be negatived because there is no direct proof of their existence prior to the fatal blow; and that the character of the weapon used, if it is used coolly and intelligently, is sufficient to give inferences by which the nature of the intent can be determined.'' In this case the intent is shown by every act of the defendant, and his conduct was such as evinced a heart void of social duty and wholly bent on mischief. The murderous purpose to draw some one into a dispute with him and then strike him down with his hidden weapon is made apparent and furnished ample grounds for the jury to find that the killing of deceased was premeditated and deliberate.

The fourth instruction given by the court fully and correctly declared the law on this point to the jury, and this exception must be held to be unsupported. The plea that defendant was in a violent passion and excited state of mind will not avail him as a defense or palliation of his act in killing deceased who was in no manner responsible by word or act for the assumed violent passion. A man can not embroil himself in a controversy with one man and when that is over kill another unoffending and unsuspecting citizen who was no party to his quarrel and who had given him neither just nor lawful provocation, and the court properly refused to instruct the jury that the passion aroused in defendant, if any, by his quarrel with his uncle, George Tate, was a defense or palliation for his unprovoked assault upon Ward, the deceased. Such a doctrine would enable the murderously inclined to feign a difficulty with one as a pretext for killing any unoffending citizen. There is no warrant for it in the cases cited, nor anywhere else

in our criminal law, and hence the court correctly instructed the jury in its twelfth instruction.

IV.  Error is assigned on the failure of the court to instruct on manslaughter in the third and fourth degrees.  It is obvious that an instruction on manslaughter in the third degree would have been without support in the evidence.  There can, under our statute defining manslaughter in the third degree, be no such thing as manslaughter in the third degree when the killing is intentional.  Here all the evidence shows the killing was with a deadly weapon, and but one intent, that of an intention to kill, can be deduced from defendant's act.  [State v. Dunn, 80 Mo. 681; State v. Pettit, 119 Mo. 416; State v. Barutio, 148 Mo. 255.]

But without pursuing the failure to instruct on manslaughter in either degree further, it is sufficient to say that the defendant neither asked an instruction on either and did not pray the court to instruct on all the law of the case, and did not save any exceptions to its failure so to do, and hence the point now raised is not before us for decision.  Such has been the unbroken line of adjudications in this court since the case of State v. Cantlin, 118 Mo. 100.  [State v. Albright, 144 Mo. 642.]

But counsel argue that the amendment of the fourth subdivision of section 2627, Revised Statutes 1899, enacted by the General Assembly at the session of 1901 (Laws 1901, p. 140), whereby it is provided that *"whether requested or not,* the court must instruct upon all questions of law in the case," shows a clear intention to change the law as declared by this court.  If we could so construe that amendment, it would be our duty to conform to it, but in our opinion it does not reach the point decided in the Cantlin case.

Without this legislative declaration it has been the law of this State since the State v. Hardy, 7 Mo. 609, that it was the duty of the court in a criminal case to declare the law applicable to the case.  But this is no more imperative than is its duty to admit only proper evidence in the case or to perform any other well-defined statutory duty, the neglect of which is ground for ob-

jection, and exception, and unless exceptions be properly saved to the error of the court in failing to perform such duty, there is no ground for reversal of the judgment.

So, while under the amendment (which, after all, is only declaratory of the law, as it has been declared by this court since 1842) it is the duty of the court in a criminal prosecution to declare all the law of the case, "whether requested or not," its failure so to do is only error, and error to which the defendant must save his exceptions if he would have this court review it.

We have read the record and given a most careful consideration of the assignments of error and have reached the conclusion that defendant had a fair trial and there is no reversible error in the transcript. The judgment and sentence of the circuit court is accordingly affirmed, and the sentence of the law is directed to be executed. All concur.