# THE STATE v. ROBERTSON, Appellant.

### Division Two, December 9, 1903.

1. **Information:** LOADED PISTOL: CHARGE OF ONE BALL: PROOF OF TWO. Where an information charges that the pistol with which defendant shot and killed deceased was "then and there loaded with gunpowder and *a* leaden bullet," it does not matter that the proof shows that the pistol was loaded with at least *two* leaden balls, and that deceased was killed at the second shot. The information is sufficient to charge. the *one* ball with which defendant shot deceased.

2. **Murder:** FIRST DEGREE: INSTRUCTION: EVIDENCE OF INTENTION TO KILL. Where witnesses testify to statements of defendant that he went to the town where deceased lived for the purpose of securing the signature of deceased to a note, and that if he refused he intended to kill him, an instruction is proper which told the jury that if they found that defendant went to the town with such intention, and that deceased did refuse to sign the note, and that thereupon defendant killed him, he was guilty of murder.

3. **Manslaughter:** INTENTIONAL HOMICIDE. Where the evidence shows that the homicide is intentional, there can be no such thing as manslaughter in the third degree.

4. **Murder:** SECOND DEGREE: DEFINITION. Murder in the second degree is the wrongful killing of a human being with malice aforethought but without deliberation. It occurs when the intent to kill is, in a heat of passion, executed the instant it is conceived, or before there has been time for the passion to subside.

5. ———: ———: CASE STATED. The evidence showed that defendant, who was a son-in-law of deceased, went to the town where deceased lived to procure the signature of deceased to a note, intending to thereupon deliver to him a deed to land which defendant owned; that deceased declined to sign the note; that defendant remonstrated with him, whereupon deceased reminded defendant of assistance he had previously given him, and that thereupon defendant, without provocation, shot and killed deceased. Deceased was unarmed. There were no words of opprobrium or degrading epithets which would arouse such a heat of passion as to reduce the homicide to a lower grade than murder in the first degree. *Held*, that the evidence is sufficient to support a verdict of guilty of murder in the first degree, and that the trial court properly refused to instruct upon any lower grade of homicide.

6. **Information: FAILURE TO USE "THEREBY."** An information which alleges that "with the bullet so shot out of the pistol defendant gave the deceased one mortal wound and of the mortal wound aforesaid he died," is not defective because it fails to employ the word "thereby."

Appeal from Adair Circuit Court.—*Hon. Nat. M. Shelton,* Judge.

AFFIRMED.

*J. M. McCall* for appellant.

(1) The information avers and charges that defendant made an assault upon deceased with a pistol loaded with gunpowder and a leaden bullet. The evidence is conclusive that at the first discharge of the pistol a leaden ball was discharged therefrom, and that said ball did not strike the deceased, but did strike the window; then, after the first fire, the pistol, so far as the information is concerned, was only loaded with gunpowder and as such could not be a deadly weapon, and the State ought not to be permitted to introduce any evidence to show that it was loaded with other leaden bullets. The demurrer should have been sustained. (2) The court erred in giving instruction 8 for the State. There was not a particle of evidence that the defendant went to Brashear with the intention or design of either compelling Conkle to sign a note with or for him, or of killing him if he refused—there was no evidence to predicate this instruction upon—there was no evidence that defendant had ever made any threats to do deceased any harm, and the evidence of the State's witnesses is that when defendant and deceased met in Brashear, on the day of the homicide, they were on friendly terms and talked the matter over in a business way. (3) The court erred in failing to instruct on murder in the second degree. The shooting was done

in a heat of passion and the court did not instruct upon the defendant's evidence in this particular. Besides this, the evidence for the State fails to show the element of deliberation. (4) The court erred in failing to sustain defendant's motion in arrest. The information is fatally defective in that it does not allege and charge that by reason of the wounding the deceased was (thereby) given one mortal wound; nor that by reason of said wounding he (thereby) died; or words of similar import. It is an inflexible rule in criminal pleadings that in all indictments for felonies, nothing can be left to intendment or implication. State v. Furgeson, 152 Mo. 92; s. c., 162 Mo. 668; State v. Hagan, 164 Mo. 654.

*Edward C. Crow,* Attorney-General, and *Sam B. Jeffries,* Assistant Attorney-General, for the State.

(1) The simple reason that the gun may have contained more than one bullet is not sufficient to excuse the defendant from the charge in the information. While it may be true that the first shot from the pistol had no effect upon the deceased, but that he died from the effect of the third shot, yet the averment contained in the information is sufficient to support that fact and to warrant a verdict of guilty of murder in the first degree. (2) There was ample evidence showing that defendant went from Kirksville to Brashear with the sole purpose of securing the signature of deceased to the note in question and if he refused that he intended to kill him. Several witnesses testified as to declarations made by defendant in this respect. This, in connection with the fact that defendant and deceased had not been on friendly terms, is sufficient to support instruction 8, and no error was indulged in prejudicial to defendant in giving it to the jury. (3) The evidence shows no element of manslaughter. Defendant is shown to have been guilty of murder in the first degree, an inexcusable and unjustifiable homicide, no

provocation whatever being shown for his conduct in the premises. The conduct of deceased was not such as to arouse or excite a heated passion in the breast of defendant. There is no evidence showing a provocation of that character; on the other hand, the whole of the testimony is to the effect that defendant left Kirksville and went to Brashear for the purpose of securing the signature of deceased to a note by which he could obtain two hundred and fifty dollars from the bank, and unless deceased signed the note defendant intended to kill him. It further shows that this intention was carried out and just as soon as defendant found that deceased did not intend to comply with his request he raised his gun and fired the fatal shot, which constitutes murder committed under circumstances which authorize a conviction for murder in the first degree. (4) It is not necessary to instruct on a lower degree than that warranted by the evidence, nor is it necessary to instruct upon any particular degree of murder unless there is evidence that the homicide was committed under circumstances which would constitute murder in that degree. State v. Sneed, 91 Mo. 552; State v. Robb, 90 Mo. 30; State v. Anderson, 89 Mo. 312; State v. Anderson, 98 Mo. 461; State v. Stilz, 97 Mo. 202; State v. Ellis, 74 Mo. 207; State v. Blunt, 91 Mo. 503; State v. Smith, 114 Mo. 604.

GANTT, P. J.—From a conviction of murder in the first degree in the circuit court of Adair county, the defendant prosecutes this appeal.

The prosecution is by information filed by the prosecuting attorney verified by his affidavit.

The information, save in one immaterial point, is in the usual form, long approved, and it is unnecessary to set it forth at length. The arraignment was regular, and no complaint is made as to the selection and impaneling of the jury.

The information charges that defendant on the 13th day of November, 1902, at the county of Adair in this State, willfully, deliberately, premeditatedly and of his malice aforethought, shot and killed George Conkle.   The facts are in substance the following:

The shooting took place at the town of Brashear in Adair county. Deceased was defendant's father-in-law, a man about sixty-five years of age, who resided on a farm about half a mile outside the corporate limits of the town of Brashear.   Defendant married deceased's daughter some years ago and lived with her until he left Missouri and went to Kansas several years thereafter.   She then secured a divorce.   In 1898, defendant enlisted in the service of the United States in the Spanish-American war.   He returned by way of Washington to St. Louis and then to Kirksville.   He went to Brashear and wrote a note to his former wife with the proposition that they should be married again. His proposition was accepted, but not without the opposition of the deceased and his family.   Shortly afterwards the defendant bought a piece of land near Kirksville.   In order to secure the money with which to pay for the farm, the deceased became defendant's security for one hundred dollars, while the balance was secured by deed of trust on the land.   A short time prior to the 13th day of November, 1902, defendant and his wife concluded to sell the land and offered it to the deceased's brother, but he, fearing that some trouble might arise, declined to entertain the proposition.

On the morning of the homicide, the defendant and his wife boarded the train at Kirksville and went to Brashear for the purpose of selling the property to the deceased.   Before leaving Kirksville a conveyancer was obtained and a deed to the land drawn conveying it to deceased, which was signed and acknowledged by the defendant and his wife.   On reaching Brashear defendant went to the bank and asked the cashier if a note for one hundred and fifty dollars signed by the

deceased was good.   The cashier told him that it was.
Defendant then said he would go out and secure the
signature of deceased to the note and return.   The note
was made payable to the bank.   The defendant and his
wife left the bank and walked down the street about
sixty feet when defendant noticed the deceased in a
hardware store.   He requested his wife to go in and
call her father out.   This she did.   The deceased, de-
fendant, and defendant's wife then walked from the
hardware store to the corner, when defendant asked
the deceased to sign the note, stating that they would
then deliver the deed they had already executed to the
land to him.

About this time Harvey Johnson, a witness for the
State, came up and he heard the defendant say to the
deceased, ''How can you treat me so?'' and the de-
ceased said, ''Treat, hell, see what I have already done
for you,'' and in a moment thereafter the shooting oc-
curred, the defendant stating that the deceased then
threatened to do him some violence and made an at-
tempt as though to draw a knife, and he drew a revolver
and shot.   The deceased lived but a few minutes there-
after.   The defendant was arrested in a short time,
but not until he had endeavored to shoot himself and
had cut himself badly with a knife in an attempt to take
his own life.   He was so weakened from the loss of
blood that he became unconscious and remained in that
condition for a considerable time.

In rebuttal, witnesses for the State testified that
the deceased was in their full view during the conver-
sation between deceased and defendant and that de-
ceased at no time drew a knife or made any demon-
stration of an assault on defendant.   The instructions
will be noticed in the course of the opinion.

I.   The first error assigned is that because the in-
formation alleges that the pistol with which defendant
shot and killed deceased was ''then and there loaded

with gunpowder and *a* leaden bullet," and that "with the leaden bullet aforesaid, out of the pistol aforesaid, then and there by force of the gunpowder aforesaid by the said John Robertson discharged and shot off as aforesaid," the defendant "did strike, penetrate and wound him the said George Conkle," and the proof disclosed that the pistol was loaded with at least *two* leaden balls, the State's case must fail, because when the first shot was fired the only leaden ball alleged to be in the pistol had been discharged, and after this first fire there was, so far as the information goes, no other leaden ball in it, and the State ought not to be permitted to show defendant shot and killed deceased at the second shot, as all the evidence shows he did.

This objection can not be seriously considered. It matters not how many other balls were in the pistol, the information was sufficient to charge the *one* ball with which defendant shot and killed deceased. This is the *one* with which the information charges the pistol was loaded, and with which deceased was killed.

II. Among other instructions given by the court was the following numbered 8: "If you find and believe from the evidence beyond a reasonable doubt that on the day of the homicide proved by the evidence defendant went to Brashear with the intention or design of either compelling George Conkle to sign a note with or for defendant, or of killing said Conkle if he refused to sign such note, and that he requested said Conkle to sign such note, and that Conkle refused to do so, and that defendant thereupon did kill said Conkle because of such refusal, then you should find defendant guilty of murder in the first degree."

This instruction is urged as error, for the reason, as defendant insists, that there was no evidence that defendant went to Brashear with the intention or design of either compelling Conkle (the deceased) to sign

a note with or for him, or of killing him if he refused to do so.

S. M. Moore, a witness, testified to a conversation he had with defendant after the homicide in which witness said to defendant, "It was too bad that he went there and got into that trouble," and he (defendant) said, "No, it is not too bad. I went down to kill him and did it. There's nothing too bad about it. I feel better than I have for ten years."

J. T. O'Bryan, another witness, testified, "I asked the question, did he go down to Brashear to kill that man, and he said, 'Not necessarily.' I asked him what he meant by 'not necessarily.' Does that mean if he did not sign that note you would kill him? and he said, 'Yes, that's the way to put it.' "

John Musick, another witness, testified that he heard Mr. Johnson ask him (the defendant), "Did you tell Mr. Conkle before I came out of the store you would kill him if he did not sign that note?" and defendant said, "Yes, sir; I had no choice."

Another witness, C. W. Gordon, testified that defendant asked him, "Is he (Conkle) dead? I said, 'Yes, John, did you intend to kill him?' and he said, 'I did.' I said, 'Are you satisfied?' and he said, 'I have no regrets.' "

In view of all this direct testimony in addition to all the other facts in evidence, it is clear that the objection to this instruction is untenable.

III. The defendant prayed a number of instructions which the court refused.

Instruction numbered 5 requested the court to submit whether defendant was guilty of manslaughter in the third degree. Such an instruction would have been manifestly improper in view of the evidence in the case. We have again and again ruled that there can be no such thing as manslaughter in the third degree when

the homicide is intentional. [State v. Pettit, 119 Mo. 416; State v. Barutio, 148 Mo. 249.]

The fourth instruction asked by defendant was a mere comment on the evidence.

Instruction numbered 3 was in effect a prayer for an instruction on murder in the second degree, and if the evidence justified such an instruction it was error to refuse it, even though not couched in a perfectly correct formula.

Did the testimony warrant such an instruction?

On the part of the State the evidence discloses that the defendant armed himself with a deadly weapon and went to Brashear with the intention of compelling his father-in-law to purchase his tract of land, or kill him if he refused. It appears that when the deceased declined to take the land and sign the note, the defendant remonstrated, whereupon his father-in-law reminded him of the aid he had already given him, whereupon the defendant, without any provocation, either lawful or just, shot him to death. The evidence also shows that the deceased was at the time unarmed, having not even a pocket knife about his person.

On the part of the defendant the case depends entirely upon his own unsupported evidence, which, in detail, is as follows: "I handed him (Conkle) the papers and told him that Jackson Conkle had backed out on the deal on account of his telling Jackson not to buy it; he might cause him some trouble. I said, 'We came to see if you would not take the place. You could turn it over to Jackson or keep it on shares. We have no money. We have nothing to eat. You know it.' He said: 'Yes, I know you are starving, you will have to starve worse.' He stuck his left hand in his pocket and said 'Damn you, go away from here or I'll fix you.' He got his knife out of his pocket. I said, 'Don't do that. I have got a gun. I don't want any trouble. I didn't come for trouble, Mr. Conkle. I don't want any more trouble at all.' Well, we kinder moved back on

the sidewalk running north and south. I told him, 'You take the deed, George. Don't be so cruel. Take it. You know we have no money. You know we are starving. Let us have no more trouble.' He keeps his hand on his knife all the time. He made a quick movement and pulled his knife out, and to make a long story short I don't know what took place after that. My brain seemed to be wild.'' The defendant denied the statements attributed to him by Johnson, O'Bryan, Gordon and others. He testified that he had no intention or purpose of doing deceased any harm when he went to see him on the day of the homicide. He does not testify directly that he shot deceased because he apprehended deceased was about to kill him or do him some great bodily harm and did so to prevent the apprehended danger, but the circuit court, giving him the full benefit of his evidence, instructed the jury fully and fairly on the law of self-defense and we think properly did so and left it to the jury to determine the facts.

Did his testimony require the court to instruct on murder in the second degree? Few questions are more difficult of solution than to determine whether the evidence in a given case is sufficient to reduce a homicide from murder in the first degree to murder in the second degree.

Murder in the second degree has been defined by this court to be the wrongful killing of a human being with malice aforethought but without deliberation. It is where the intent to kill is, in a heat of passion, executed the instant it is conceived or before there has been time for the passion to subside. ''Heat of passion'' is not used in its technical sense but as a condition of the mind contradistinguished from a cool state of the blood. An example is given by Judge HENRY in State v. Wieners, 66 Mo. loc. cit. 25, as where A and B who had been on friendly terms have an altercation and A calls B a liar and B, instantly, with a deadly weapon, in a passion engendered by the insult, kills A. In such case

the deliberation essential to murder in the first degree is absent and the killing is murder in the second degree.

In State v. Sneed, 91 Mo. 552, the evidence on behalf of the State tended to prove, as does the testimony in this case, a case of murder in the first degree, but the defendant, in his own behalf, testified that deceased and he were walking together when deceased reached around him, and upon being asked by defendant what he meant by that, said, "I have been laying for you and I am going to give it to you now," and made a plunge at him with a knife in his hand, whereupon defendant drew his pistol and shot deceased. This court, in determining whether an instruction on murder in the second degree should have been given, said: "If the deceased was killed under the circumstances detailed by the witnesses on the part of the State, the crime of murder in the first degree was fully made out and there is nothing in the evidence which required the court to give instructions upon any other grade of homicide. If, on the other hand, the deceased was killed under the circumstances detailed by defendant, the law of self-defense justified him in the killing."

In State v. Robinson, 73 Mo. 308, it was held that if two friends casually meet and get into a heated controversy and one in apparent anger apply to the other some degrading epithet or impute to him some act of criminal baseness and the latter, stung to madness by the insult, should upon the instant strike and kill the former with a deadly weapon, this would be murder in the second degree.

In State v. Smith, 114 Mo. 406, it was ruled that when the testimony on the part of the State discloses a clear case of deliberate and premeditated killing by the defendant of an unarmed man who at the time was making no assault on the defendant, and the evidence on behalf of defendant makes but a case of self-defense, there is no place for an instruction on any lower grade

than murder in the first degree. The facts of this case bring it within the principle of those cases.

Even the defendant's unsupported evidence discloses no such words of opprobrium or degrading epithets as would naturally arouse such a heat of passion as would reduce the homicide to a less degree than murder in the first degree, and the circuit court properly so declared in its instructions.

In view of all the evidence we are of opinion that the circuit court properly declined to instruct upon any lower grade of homicide than murder in the first degree.

IV. The information was not defective in failing to use the word "thereby" in connection with the charge that by reason of the wounding the said Conkle died. It alleges that "with the bullet so shot out of the pistol defendant gave the deceased one mortal wound and of the mortal wound aforesaid he died." This was all that was necessary.

This record presents a most unnatural crime. The deceased, who was the father-in-law of defendant, was in no manner responsible for the unfortunate condition of defendant's financial affairs. The evidence shows he had aided him on former occasions and because he did not desire to purchase the tract of land which defendant offered to deed him was no reason why defendant should ruthlessly take his life.

We find no extenuation or mitigation of the defendant's offense in the mere refusal of deceased to accede to his demands. The evidence tends strongly to prove a deliberate and premeditated design to slay his father-in-law, without any provocation, either lawful or just. The judgment of the circuit court must be and is affirmed and the sentence which the law pronounces must be executed.

*Burgess* and *Fox, JJ.,* concur.