## THE STATE v. HENRY McKENZIE, Appellant.

**Division Two, May 26, 1910.**

1. **CONTINUANCE: Delaying Trials.** An application which alleges a custom of delaying trials beyond the term at which the information is filed, states no legal ground for a continuance in a murder case.

2. **———: Absent Witnesses.** It is not error to refuse a continuance on account of absent witnesses where no subpoenas have been issued for them, and the application reveals no diligence in searching for them, and it is not made to appear what material testimony they would give were they present.

3. **OBJECTIONS: Immaterial: No Answer.** An objection that a question is immaterial amounts in law to no objection whatever. Besides, if the witness made no answer to the question, nothing prejudicial to defendant was elicited by it.

4. **RES GESTAE: Statements by Defendant.** Statements made by defendant to the effect that a few minutes after the homicide, and after he had left its scene and gone to the house of his sister, he talked to her and said he had killed deceased in his own defense and he was in the right, and for her to go and employ counsel, are not a part of the *res gestae*, but self-serving statements, and the trial court properly excluded them when defendant offered to show them by his sister.  They were not an undesigned and necessary incident of the litigated act.

228 Sup—25

5. **INSTRUCTION: Faulty: Request for Proper.** An instruction crudely expressed and not in proper form, is, nevertheless, to be considered a request for a proper instruction on the subject; and, if there is evidence upon which to base it, one correctly worded should be given.

6. ———: **Manslaughter in Third Degree: Intentional Killing.** There can be no such thing as manslaughter in the third degree when the killing is intentional; and where defendant's own testimony shows, if it establishes anything, that the killing was intentional, no instruction on manslaughter in the third degree should be given.

7. ———: **Manslaughter in the Fourth Degree: Provocation.** Where the testimony totally fails to show any provocation which would make the killing manslaughter in the fourth degree, no instruction on that subject should be given.

8. **REMARKS OF COUNSEL.** A remark of the State's attorney in his argument to the jury that a certain State's witness "was an honest man and did not go to his sister's to eat breakfast like defendant did," and other remarks complained of, cannot be held to have been error.

Appeal from Jackson Criminal Court.—*Hon. E. E. Porterfield,* Judge.

Affirmed.

*P. D. Clear* for appellant.

(1) Upon a casual examination of the application for continuance it will be seen that it is in regular form. In fact, Judge Porterfield overruled said application on the ground that the evidence contained in the affidavit was immaterial. This ground is wholly untenable, since proof that deceased had a knife near his hand just after he fell shows plainly that he came from behind the counter around to the door to cut and injure defendant. The overruling of said application was plainly reversible error. State v. Farrow, 74 Mo. 531. In Farrow case there were two other witnesses introduced to prove the main defense, an alibi, while here defendant was precluded by said ruling from any witness to prove the main facts of his self-defense. (2)

Defendant offered to prove that within two minutes of the homicide, he told his sister, Mrs. Wilkerson, that he had killed deceased, was in the right, and to go and employ a lawyer. This evidence was primarily competent as *res gestae,* being so close to the main fact, and being the first expression to anyone after the homicide. State v. Castor, 93 Mo. 251. (3) There was direct evidence by defendant that he shot to keep deceased off and not to kill deceased. This establishes a plain case for an instruction on manslaughter in the third degree. State v. McKenzie, 102 Mo. 633; State v. Watson, 95 Mo. 411; State v. Edwards, 70 Mo. 480. It is long since settled law that "defendant had a right to testify as to his intent, and his testimony for the purpose of instructing the jury occupied the same footing as that of any other witness." State v. Palmer, 88 Mo. 573; State v. Banks, 73 Mo. 592. The meat counter was about twelve feet back, south from the door, extending from the east wall nearly to the west wall. Behind this was the meat block and behind the block was the meat refrigerator, from which the liver in question was, of course, taken, and cut on the block and placed on the counter. Deceased came from behind this counter around the west end to a position in front and east of the small ice box where, or nearly where, he fell, so that his head would reach to two feet from the door. Then there was substantial evidence that deceased picked up the knife found underneath the counter from where he laid it on cutting the liver, and ran around the counter with it drawn in a striking attitude. Suppose now deceased approached defendant with said knife drawn, near enough to do bodily harm, but not near enough to do great bodily harm, and the jury so found, then defendant would not have complete self-defense, but only manslaughter defense. Because here we would have a lawful provocation, which legally begets passion and negatives malice, but not sufficient provocation to completely justify a homicide.

Wherever defendant has substantial rights—as to hold property peaceably, State v. Matthews, 148 Mo. 197, or to keep his daughter free from unlawful sexual intercourse, State v. Gruggin, 147 Mo. 39, or to keep himself free from attack with a weapon, State v. Garrison, 147 Mo. 557—and such attack and deprivation of right reasonably excites passion, and while in such passion he commits a homicide, only manslaughter will lie. In the Garrison case, threats accompanied the attempt on defendant's life with a hatchet, but the hatchet was already thrown when defendant shot, and it was unanimously held a proper instance for manslaughter. Here deceased, just before starting around counter, said, in a threatening manner, to defendant, ''By God, you will take it,'' and kept on after defendant around the counter, out in front thereof, until he got to a position near the door, which makes a stronger case of attempted violence, without actual battery, than in the Garrison case. There the court said, ''But if the homicide be committed under a less degree of fear and in the excitement produced by the epithet and threats of deceased,'' etc., then the killing was manslaughter. State v. Elliott, 98 Mo. 157.

*Elliott W. Major,* Attorney-General, and *James T. Blair,* Assistant Attorney-General, for the State.

(1) The first complaint made in appellant's brief is that the court erred in denying him a continuance. (a). The record shows that the information was filed November 10, 1908, the crime having been committed October 23, 1908, and appellant having been under arrest since this last date. On December 12, 1908, appellant was arraigned. The actual trial occurred December 23 and 24, 1908. The custom of delaying trials until later terms cannot be urged as a ground of continuance. Sixty days elapsed between the date of appellant's arrest and his trial. One delay of a week

was granted appellant, and the record shows no complaint on the score that the time then given was too short. (b). As to the allegations respecting the witnesses Tim Jones and S. Burnett, appellant did not procure the issuance of any subpoena for either of them. Neither does the application indicate specifically what diligence had been used or means employed in "searching" for these witnesses. The statute furnishes a plain answer to the contention concerning these witnesses. R. S. 1899, sec. 2600; State v. Woodward, 182 Mo. 419. Further, appellant testified it was "Tim Holmes" instead of "Tim Jones," who told him of the threats against his life. (c). As to the witness E. A. Brown, the application states that appellant "used every effort in keeping informed of the whereabouts of said witness Brown." It does not appear when appellant first learned to what Brown would testify. It is alleged in the application that the case had been set for December 16, 1908. No subpoena to secure Brown's appearance on that date was issued. The court is not advised how or through whom Brown was located on December 18, whether Brown was married or single, what was his occupation, who it was that "creditably informed" appellant that Brown would return to Kansas City "after the holidays," how long "after the holidays" Brown would return, in what part of Kansas City Brown had his "home," nor what connection with or information concerning Brown "J. Huey" at room 14, 3d floor, No. 404 east Fourteenth street, Kansas City, had, nor whether Brown resided in Kansas City, Mo., or Kansas City, Kansas. Appellant alleges that he "located said Brown" and then sent the marshal to "J. Huey" to "inquire as to the location of said Brown." It is not stated where Brown went, what his mission was, nor that Huey had any information relating to Brown which he could, or would have communicated to the marshal. On the showing in the application the trial court did not abuse its

discretion in refusing further continuance. State v. Woodward, 182 Mo. 419; State v. Devorss, 221 Mo. 474; State v. Williams, 170 Mo. 206. This court is not confined to the reasons attributed by appellant to the trial court. State v. Blitz, 171 Mo. 536. The case cited by appellant is wholly unlike this case and is an authority rather against appellant than in his favor. State v. Farrow, 74 Mo. 533. (2) The offer to prove by appellant that he declared his innocence in "from two to five minutes" after the killing, was properly refused. It is now contended that this was competent as a part of the *res gestae*. With this contention the cases are not in accord. State v. Walker, 78 Mo. 386. "Instinctiveness is the requisite." State v. Gabriel, 88 Mo. 639. The case of State v. Castor, cited by appellant, is not in point. The admissibility of explanations of possession of stolen property is based upon a rule not applicable to cases of homicide. The Castor case demonstrates this. (3) Appellant complains that his offered instructions on manslaughter in the third and fourth degrees were not given. Neither of the instructions offered was in proper form. Further, this was no case for such instructions. The evidence for the State made out a case of murder in either the first or second degree and the defense was self-defense and that alone. The offered instructions were properly refused. The principles laid down in a late case by this court, wherein are discussed most of the cases cited by appellant, dispose of this particular contention. State v. Myers, 221 Mo. 617. "Defendant best knew his purpose in firing the fatal shot and an instruction inconsistent with his testimony on that head should not have been given." State v. Reed, 137 Mo. 138; State v. Gartrell, 171 Mo. 522. The suggestion that the court might divide up defendant's testimony and instruct as if it were only partly true, is not supported by any authority. State v. Barnett, 203 Mo. 661; State v. Clay, 201 Mo. 688. The case of

State v. Elliott, 98 Mo. 157, is wholly unlike the case at bar. In this case there was evidence of ''a previous grudge,'' and, besides, if appellant's testimony is true there was no room for half-way measures.

GANTT, P. J.—This is an appeal from a judgment of the criminal court of Jackson county, sentencing the defendant to imprisonment in the penitentiary for life, on a charge of murder in the first degree.

The prosecution was commenced by information filed by the prosecuting attorney on the 10th of November, 1908. The information is a full and complete charge of murder in the first degree, on the 23d day of October, 1908, of one Samuel H. Moog, by the defendant Henry McKenzie, with a revolver. As the information is in the often approved form, it is unnecessary to set it forth at length.

The defendant was arrested and duly arraigned in Division No. One of said criminal court, before the Hon. Ralph Latshaw, the judge thereof, on the 12th day of December, 1908, and entered his plea of not guilty and the case was set down for hearing on December 16, 1908. The cause was then continued to the 21st of December, on which last mentioned date the defendant filed his motion for a continuance, which was overruled, and thereupon he made his application for change of venue to Division No. Two of said court, which was granted and the cause was transferred to said Division No. Two. Afterwards on the same day the application for continuance was renewed before Judge Porterfield in Division No. Two, and was overruled, and both parties announcing ready for trial, a jury was impaneled and sworn, and after hearing the testimony and instructions of the court, a verdict of guilty of murder in the first degree was rendered, and the defendant's punishment assessed at imprisonment in the penitentiary for life. A timely motion for new trial was filed, heard and overruled and the

defendant sentenced according to the verdict. Leave was given the defendant by Judge Porterfield to file his bill of exceptions on or before March 1, 1909. It appears that further extensions of time for filing the bill were granted by Judge Latshaw and the bill was finally filed within the time as so extended, but not within the time extended by Judge Porterfield, who tried the case. The bill of exceptions was signed by Judge Porterfield.

The testimony on behalf of the State tended to show that for sometime prior to the day upon which he was shot and killed by the defendant, the deceased, Samuel H. Moog, conducted a meat shop or market on the south side of Independence avenue in Kansas City, near the corner of Independence and Troost avenues. The deceased was a German by birth and fifty-five years old at the time of his death. The defendant at the time of the homicide was about twenty-seven years old. On the morning of October 23, 1908, George Hughes, a porter in the saloon nearly opposite the butcher shop of the deceased, heard a shot fired in deceased's shop just as the witness was leaving the saloon upon an errand for his employer. Almost immediately after hearing the shot he saw the defendant run out of the shop, close the door behind him and run down a narrow passageway just east of the shop. Defendant displayed no weapon at this time. There were no other persons on the street near the shop at this juncture save the porter and the defendant. Hughes immediately stepped back to the door of the saloon and informed his employer and those in the saloon of the shooting, and these persons went immediately to the scene of the homicide and found no person save the deceased in the shop. When they entered the butcher shop they found the deceased lying on the floor in a pool of blood and in a dying condition. There were no weapons near the dying man, though there was a meat knife on the meat block back

of the counter and another meat knife under the counter. The deceased was lying in front of the counter between which and the street door there was a space of about seven feet. The testimony of the coroner established that death resulted from a bullet wound. The ball had entered on the right side of the lower lip, passed through the root of the tongue and into the spinal column at the first cervical vertebra and the wound was necessarily and almost instantaneously fatal.

At the time of the homicide and some two months prior thereto the defendant lived at the house of a woman named Harris, the entrance to which house was a few feet from the rear door of deceased's meat shop. The evidence tended to show that the defendant's relations with the Harris woman were of an improper character and he had indicated his jealousy of her and the deceased by following her when she would go to the shop, waiting for her on the outside, and complaining when she came out. Immediately after the shooting the defendant entered the rear door of the house next to that in which he and the Harris woman lived, and closed the door behind him and stood up with his back to the door. In a few minutes the report of the shooting of deceased was brought to this house by a woman of the name of Clark, and was commented upon by those in the house in the presence of the defendant, but he said nothing whatever about the matter. In a few minutes after this the defendant was arrested in the house occupied by him and the Harris woman. When the officer went into the room, he says the defendant was walking up and down in the room backwards and forwards and seemed to be very nervous. The officer asked him what was the matter with him and defendant answered, "I thought I heard a shot out there." The officer then arrested the defendant and one Frank Foster, another negro, and took them into the butcher shop, and waited there

until another officer called with the police wagon, whereupon they took the defendant Foster and Ed. Harris to the police station. The officer inquired of the defendant what he was doing at the time the shot was fired, and he said he had gone out to work that morning, but had not worked because of the inclemency of the weather and had just reached home and was changing his clothes. The officer asked him if he had a revolver, and at first he denied having one, but later admitted that he did. On the next day the defendant made a statement, which was reduced to writing and signed by him. This statement, after the preliminary proof that it was entirely voluntary on the part of the defendant and without any threat or coercion, was admitted in evidence to the jury. In that statement he said that he had been living with the woman they called Miss Harris for about three months; that he worked for Gorgeson & Brink, plumbers; that he did not own a pistol and never did; that on the morning of October 23d, he went into Moog's butcher shop about eight o'clock in the morning and bought a nickel's worth of liver and took it up to Mrs. Wilkerson's, his sister's, to cook it, and then went out with a fellow called George, who lived in a big brick flat on Troost avenue with John Harold, who was a janitor there. He and Harold went to his sister's on Fourteenth and Charlotte and stayed there a couple of hours and then went to his other sister's, Eliza Teasdale, at Nineteenth and Locust, and stayed there about an hour, and then came back home and went into the house, where he sat down and two fellows came in to see Eddie Harris. Then defendant went up to Miss Holly's and while there Mrs. Clark came by and told them Mr. Moog had been shot. Whereupon, they all went out to the chute or passageway by the butcher shop together. They stood there and looked around, and then the officer arrested him.

Three days later the defendant made a second statement which was also reduced to writing and sigred by him in which he declared that when he visited the deceased's shop to make the purchase of the liver, deceased waited on him; that the meat was not good, and he, defendant, refused to take it, and asked for his money; that deceased said, "By G—d, you will take it," and picked up a butcher knife and started around the counter; that he, defendant, backed toward the door, telling the deceased to stop and when deceased refused to do so, he, defendant, fired to save his own life; that he then placed the pistol in his pocket, and taking the meat which he had purchased, went out of the shop and around to his sister's home for the purpose of cooking the meat mentioned. He put the meat on the stove, went out on the street, and then to the saloon across Independence avenue, where he turned his pistol over to Mr. 'Welch, the proprietor of the saloon. There was also evidence that the defendant and another negro had bought beer that morning which they took to the home of the defendant's sister, in the rear of deceased's shop, and also evidence from the defendant's sister, tending to show that defendant did not bring to her house the liver which he stated he purchased just before he shot and killed the deceased.

In his own behalf, the defendant testified that he was regularly employed by a firm of plumbers, but was not working on the 23d of October, 1908, because of bad weather; that he came home that day about noon to Mrs. Harris's where he was boarding at the time; that he went into the deceased's shop to purchase liver on that day, and asking for a nickel's worth, laid the money on the counter; the deceased sliced the meat with a large butcher knife; the appearance and odor of the meat was bad and defendant told deceased it was spoiled and that he wanted good liver or his money back; the deceased said, "By G—d, you will take that or none at all." The defendant said he would not,

thereupon deceased rushed at him with his knife, and the defendant backed up to the door and failing to get the door open, drew a revolver and fired; that he fired for the purpose of stopping the deceased and not to kill him; that he fired to escape the deceased's knife; that this time there was no other person in the shop, but as he backed out of the door after the deceased fell "a kind of Jewish-looking fellow" entered and picked up the knife which the deceased had dropped. Defendant testified that when he reached the sidewalk there were several persons there, some colored and some white, but that he had seen none of these persons in the court room; he said that after he left the shop, he went around to his sister's house, and explained his silence, when told of the shooting, by saying that he wanted to tell his sister what he had done and wanted to employ an attorney, as he "thought he had not done anything more than any other man would have done to protect his life." He stated that his second statement made to the police officers was elicited by means of threats; though he refused to make any statement to the officers who threatened him, and made the second statement on the day following the said threats, to different officers. He also retracted that part of his statement as to his having left his revolver with Mr. Welch, the saloon keeper, saying that he did not remember just what he did do with the revolver. He laid it down, but did not know where. He adhered to his statement that he had taken home the meat he had purchased and put it in a pan on the stove. He denied that he was jealous of the Harris woman, denying that he and she were living together as man and wife, and declared that he had no ill feeling toward the deceased. On cross-examination he testified that the revolver he had used had been given him by a friend of his the day before the killing. He gave the name of his friend, but was unable to say where he

was. In explanation of his former statements he said he was excited and hardly knew what he did say.

On the part of the defendant, Dr. Fry testified and gave it as his opinion that from the course the ball took the deceased must have been leaning with his head forward at the time he was shot. He also testified that he knew the reputation of the defendant in the neighborhood in which he resided and that his reputation for peace and quietude was good. Defendant also offered evidence tending to show that the reputation of the deceased for peace and quietude was bad.

In rebuttal, the State offered evidence tending to show that the reputation of the deceased for peace and quietude was good. The State also offered evidence contradicting the defendant's statement that threats were employed to secure his written confession or statement made soon after the killing, and also testimony tending to impeach the evidence of Susan Wilkerson, the sister of defendant.

The instructions will be noted in the course of the opinion. Various errors are assigned for a reversal of the judgment.

I. It is insisted that both Judge Latshaw and Judge Porterfield erred in denying the defendant a continuance and overruling his application therefor. No error was committed in overruling this application for continuance. That portion of the application which alleged the custom of delaying trials until later terms, obviously presented no legal reason for further delays. As to the absence of defendant's witnesses, Tim Jones and S. Burnett, no subpoenas had been issued for either of them, nor does the application indicate that diligence had been used in searching for these witnesses, nor does it appear that the evidence which they would have given would have been material on the trial. Moreover, we think the application does not

measure up to the requirements of the statutes. [R. S. 1899, sec. 2600; State v. Woodward, 182 Mo. l. c. 419, et seq.]

It may be added also in this connection that when the defendant himself was testifying he stated that Tim Holmes was the person who told him of threats against his life, and not Tim Jones, the witness on account of whose absence he desired a continuance. As to the witness E. A. Brown the showing was entirely inadequate, as the application on its face afforded no reasonable ground for believing that this witness could be secured. We find nothing in State v. Farrow, 74 Mo. l. c. 534, that in the least militates against our conclusion.

II. Complaint is made that the court erred in admitting incompetent evidence over defendant's objection. Under this head the first specification is as to certain questions propounded to Susan Wilkerson, a witness for the defendant and a sister of the defendant. The first question to which objection was made was: "He usually fed at your table didn't he?" The record discloses that she made no answer to this question, and hence nothing prejudicial to the defendant was elicited by the query. Moreover, this was a cross-examination of the witness and the only objection to the question was that it was immaterial, which amounted to no objection whatever in law. Another question was: "How do you support your children?" To this defendant objected on the ground that it was immaterial. While the court overruled the objection as insufficient, the witness made no answer thereto, and hence no error was committed in this regard. She was then asked in regard to the movements of the defendant: "Then he went out and got a can of beer that the other man paid for?" To this the objection was that it was immaterial, and she answered, "Yes, sir, he went out and got the can of beer."

While the objection was entirely insufficient, the evidence was clearly competent. On cross-examination, in connection with the testimony which the defendant himself had given in regard to his going out to work that morning, but was unable to do so on account of the weather, his testimony indicated that he intended to be understood that immediately upon his return he had gone to the shop of the deceased, and the evidence on the part of the State tended directly to contradict this, but in no event was it of sufficient importance to demand a reversal of the judgment, and the same may be said in regard to another question as to his loafing around at Mrs. Harris's and eating at his sister's and doing nothing, as the only answer obtained to this question was that she did not know anything about it.

The most material question raised as to the competency of evidence was an offer to prove by Susan Wilkerson, his sister, that right shortly or in a very few minutes after the killing of the deceased, the defendant talked to her and said he had killed Mr. Moog in his own defense and he was in the right, and for her to go and employ counsel; that this took place from within two to five minutes after the killing, which evidence was excluded by the court and the defendant saved his exceptions. It is now contended that this statement of his was a part of the *res gestae*. Perhaps nowhere has the doctrine of what constitutes the *res gestae* been better stated than by Mr. Wharton in his work on Evidence, vol. 1, section 259, in which he says: "The *res gestae* may, therefore, be defined as those circumstances which are the undesigned incident of a particular litigated act, and which are admissible when illustrative of such act. These incidents may be separated from the act by a lapse of time more or less appreciable. They may consist of speeches of any one concerned, whether participant or bystander; they may comprise things left undone as well as things

done. Their sole distinguishing feature is that they should be the necessary incidents of the litigated act; necessary in this sense, that they are part of the immediate preparations for or emanations of such act, and are not produced by the calculated policy of the actors. In other words, they must stand in immediate causal relation to the act—a relation not broken by the interposition of voluntary individual wariness seeking to manufacture evidence for itself. Incidents that are thus immediately and unconsciously associated with an act, whether such incidents are doings or declarations, become in this way evidence of the character of the act. They are admissible, though hearsay, because in such cases, from the nature of things, it is the act that creates the hearsay, not the hearsay the act.''

Tested by this rule, we think that the learned criminal court correctly excluded this testimony. On its face it was clearly nothing but a narrative of a past event not contemporaneous with the main facts, nor so connected with it as to illustrate its character. In other words it is what has often been denominated by this court ''a self-serving statement.'' [1 Greenleaf's Evidence, sec. 108; 1 Wharton on Evidence, sec. 261; State v. Walker, 78 Mo. 388.]

The defendant had left the scene of the homicide and gone to his sister's house and had had ample time to concoct a story to account for his part in the homicide. We think there can be no doubt that it was not a part of the *res gestae*, and was properly excluded.

III. The defendant urges the refusal of two instructions offered by him on manslaughter in the third and fourth degree.

Instruction number five requested by the defendant was in these words: ''The court instructs the jury on behalf of the defendant that if deceased advanced from behind the meat counter in evidence in a threatening manner and made an assault on the defendant

and defendant, by reason thereof, was thrown into hot blood, and while in such hot blood intentionally shot and killed defendant [deceased]—then, unless you find from all the evidence in the case beyond a reasonable doubt that the above mentioned things set out in this instruction are not true—you can in no instance find defendant guilty of more than fourth degree manslaughter, on the theory that defendant had not fully made out his case of self-defense.''

The sixth instruction requested by the defendant and refused by the court was in these words: ''If deceased advanced from behind the counter on defendant voluntarily and made an assault on him, the defendant, and by reason thereof the defendant was thrown into hot blood, and while yet in said hot blood he shot deceased, not intending to kill defendant [deceased] but to keep him off as testified by defendant, then unless you find from all the circumstances and facts proven in evidence beyond a reasonable doubt that the things set out in the aforesaid instruction are not true then you cannot in any instance find defendant guilty of more than third degree manslaughter.''

Neither of these instructions was in proper form, but under the rulings of this court if the evidence justified instructions on manslaughter in the third or fourth degree, they might be taken as requests for proper instructions on manslaughter; so that the real question is, did the evidence require any instructions on manslaughter? It has been repeatedly decided by this court that there can be no such a thing as manslaughter in the third degree, under our statute, when the killing is intentional; and the defendant's own testimony, if it establishes anything, shows that he intentionally shot and killed the deceased. [State v. Pettit, 119 Mo. l. c. 416; State v. Barutio, 148 Mo. 249; State v. Goldsby, 215 Mo. 55.] The facts of this case abundantly distinguish it from those in State v. Elliott, 98 Mo. 150.

228 Sup—26

As to manslaughter in the fourth degree the testimony is wholly wanting to establish any provocation which would make the offense manslaughter in the fourth degree. [State v. Gartrell, 171 Mo. l. c. 520, and cases there cited.] Under the defendant's own statement he was guilty of murder in the first or second degree or was entitled to be acquitted on the ground of self-defense.

IV.   Much stress is laid by counsel of the defendant upon the remarks of the prosecuting attorney as constituting error.   Many of these statements were objected to at the time and exceptions saved, and we have read the alleged remarks, and as in other cases where the whole address of the prosecuting attorney is not preserved, it is possible that we do not see the bearing and the weight of some of his statements.  Thus counsel has preserved the remark of the prosecuting attorney "That Hughes was an honest man and did not go to his sister's to eat breakfast like defendant did." Certainly this statement does not appear to be exceedingly harmful.  It was rather complimentary to Hughes and may have been somewhat derogatory to the defendant, and was probably stated by the prosecuting attorney to meet the contention that defendant was a very industrious negro.  It was not perhaps a very weighty argument, but it is plainly apparent that it did not constitute reversible error.  There is absolutely no ground for complaint in the statement of the assistant prosecuting attorney that the defendant denied killing Moog.  Counsel for the State was fully justified in making this argument from the fact that the defendant had made a statement which to all intents and purposes amounted to a denial of any knowledge whatever of how Mr. Moog came to his death.  It was a legitimate argument upon the facts developed in the case.

As to the complaint that the court directed the jury that the question of the right of the defendant

to a continuance was one for the court, certainly on the face of the record this was an undeniable proposition. Moreover, there is nothing in the record to show that the reference of counsel for the defendant to this application for continuance was not such as to justify the ruling of the court. What that reference was is not disclosed and of course we cannot determine whether it was proper or improper, but we deem it unnecessary to repeat all these exceptions to the remarks of the counsel for the State. We have read them and with this continual interruption it appears to us that the counsel for the State must have had a difficult task in endeavoring to present the State's side of the case to the jury. We have been unable to find anything in the statements of the prosecuting attorney to justify the charge of oppression in his office or a misstatement of the facts in evidence.

We have read the evidence in the case, and we think it justified the jury in believing that the defendant was actuated by jealousy of the deceased in killing him. Certain it is that he went into the shop of the deceased armed with a deadly weapon, a revolver, and found him alone and shot and killed him; that he then fled from the scene of the crime, and when first questioned about his knowledge of it, endeavored to account for his own whereabouts in such a manner as to mislead the officers and cause them to believe that he had no part in the killing. His conduct in fleeing from the butcher shop where he had shot and killed the deceased and his contradictory statements in regard to his having a revolver and his disposition of it; his silence when the negro women, immediately after the homicide, were discussing the death of Mr. Moog; and many other facts and circumstances in the case, all tend to prove that at that time he thought that his guilty participation in the crime was entirely unknown, and when afterwards it was discovered that he had been seen to emerge from the butcher shop immediately

after the report of his pistol had been heard and that there was no one else in the immediate vicinity but himself at the time of the homicide he sought to exculpate himself on a plea of self-defense.

He had the full benefit of his own testimony on that plea in which he admitted the shooting and killing of the deceased and the jury found that issue against him and there is nothing to indicate that the jury were actuated by passion or prejudice, but were fully justified in rejecting his claim of self-defense on account of the unreasonable story which he detailed.

In our opinion there was sufficient evidence to justify the verdict at which the jury arrived. We see no error whatever in the instructions of the court and accordingly the judgment of the criminal court is affirmed. All concur.