## THE STATE v. FLOYD H. ROGERS, Appellant.

Division Two, December 9, 1913.

1. **REFERENCE STATUTE: Amended by Amendment of the Statute Referred to: Procedure.** When a reference statute specifically designates the section or article of which it is made a part, such reference statute will not be changed or modified by any subsequent change in the statute to which it refers. But where it pertains only to methods of procedure and refers generally to some statute which defines how certain things may be done, such reference statute will be expanded, modified or changed as the statute referred to is changed.

2. ———: ———: **Filing Bill of Exceptions in Criminal Case.** Sec. 5245, R. S. 1909, stating that in criminal cases "bills of exceptions shall be settled, signed, sealed and filed as *now* allowed by law in civil cases," does not refer to or become a part of any particular section of any statute, but refers generally to those sections of the Code of Civil Procedure relating to appeals, of which there are several sections; consequently, when the Civil Code was amended in 1911, Laws 1911, p. 139, so as to permit the filing of a bill of exceptions after the time had expired within which the court had required such bill to be filed, section 5245 underwent the same amendment, and since that amendment bills of exceptions in criminal cases may be filed within the same time and upon the same terms and conditions as bills in civil cases.

3. **BILL OF EXCEPTIONS: In Criminal Case.** A bill of exceptions not filed within the term at which defendant was convicted nor within the time after the expiration of the term granted by the trial court, yet if filed within the time permitted by the amendatory act of 1911, Laws 1911, p. 139, will be considered on appeal.

4. **EVIDENCE: Motive: Res Gestae: Remarks Indicating Malice Made Soon After Homicide.** Where there had been discord and trouble between defendant and Walls, and deceased had been hired to take defendant's position as a farm hand on Walls's farm and had become engaged to marry Walls's niece, and defendant had gone to Walls's house at the request of said. niece to persuade Walls and deceased, who were in a drunken condition, not to go away to church, and while there a quarrel arose and defendant killed deceased, who was unarmed, a statement made by him to the landlord of the house where he boarded, to which, two hundred yards from the scene, he had returned immediately after the homicide and where he took down a shotgun and loaded it, that he would "go back and kill every d—d one of them," was admissible as a part of the *res gestae*, and competent to establish felonious intent and motive, since it indicated a feeling of intense malice against the whole Walls family, and from it the jury might properly infer that the shooting of deceased was the product of malice or a desire for revenge.

5. ——: ——: ——: ——: **Instruction: Unwarranted Comment.** But while said evidence was competent, an instruction on behalf of the State telling the jury "that anything defendant may have said after shooting deceased, if anything, to the effect that defendant had a notion to take a shotgun and go back down there and kill the whole d—d outfit, or words to that effect, is competent and admitted only for the purpose of showing the condition of mind of the defendant at that time," was an unwarranted comment on the evidence, and error, in that it singles out certain evidence and tells the jury that it is admitted for a specific purpose.

6. **REMARKS OF COUNSEL: Disgrace to Acquit.** If the prosecuting attorney believed a crime had been committed he had a right, as a matter of argument, to tell the jury that "it would be a disgrace for you to acquit the defendant under the testimony."

Appeal from Dunklin Circuit Court.—*Hon. W. S. C. Walker*, Judge.

REVERSED AND REMANDED.

*Fort & Zimmerman* for appellant.

(1) The law of self-defense does imply the right of attack. State v. McDonald, 57 Mo. 13; State v.

Matthews, 148 Mo. 193; 25 Am. & Eng. Ency. Law (2 Ed.), 274 et seq.  (2) The instruction on self-defense is inconsistent and misleading.  The court states in positive and unequivocal terms that the law of self-defense does not imply the right of attack, but follows this statement of the law with the negative statement of the proposition that the law of self-defense does imply, under certain circumstances, the right of attack.  The force and effect of such an instruction could not do otherwise than confuse and mislead the jury in their consideration of the acts of defendant, at the time of the shooting, and was, therefore, prejudicial to defendant's defense.  2 Ency. Pl. & Pr., p. 145, sec. 6.  (3) These statements made to Blankenship and Hardy were in no part of the *res gestae* and did not stand in immediate causal relation to the act of shooting.  The shooting was admitted, no plea of insanity was made and too great a time had elapsed since the killing, to make these statements competent or material for any purpose.  State v. McKenzie, 128 S. W. 952; 3 Wigmore on Ev., p. 2253, sec. 1749 and notes.  Defendant lived more than two hundred yards from the scene of the homicide.  After the shooting, he walked home.  On arriving home, defendant put up the gun, explained what had happened and did not seem to be excited or agitated in mind.  (4) The instruction given by the court, permitting the jury to consider the statements made by defendant after going home, was an unwarranted comment on the evidence.  It is error to single out, in an instruction, a particular portion of evidence, to the exclusion of the rest, and submit the part, thus particularized, to a jury; or, to comment upon any particular part of evidence. State v. Holmes, 144 S. W. 418; State v. Mitchell, 129 S. W. 917; State v. Shelton, 122 S. W. 732; State v. Chinn, 133 S. W. 1196; 3 Ency. Pl. & Pr. 185, sec. 12, et seq.

*John T. Barker,* Attorney-General, and *W. T. Rutherford,* Assistant Attorney-General, for the State.

(1) Where one statute adopts the particular provision of another by a specific and descriptive reference to the statute or provisions adopted, the effect is the same as though the statute or provisions adopted had been incorporated bodily into the adopting statute. 2 Lewis's Sutherland's Stat. Const., sec. 405, p. 787, and cases in note 27. (2) Such adoption takes the statute as it exists at the time of adoption and does not include subsequent additions, amendments, modifications or repeal of the statute so taken, unless it does so by express intent. 3 Lewis's Sutherland's Stat. Const., sec. 405, p. 708, and cases in notes 29 and 30. (3) Another form of adoption is one wherein the reference is not to any particular statute or part of a statute, but to the law generally which governs a particular subject. The reference in such case means the law as it exists from time to time or at the time the exigency arises to which the law is to be applied. 2 Lewis's Sutherland's Stat. Const., sec. 405, p. 789, and cases in notes 36 and 37. (4) "As is now provided by law," means as is provided by law at the time of the enactment of the law. Chapman v. Holmes, 10 N. J. L. 26; Pike v. Kennedy, 15 Ore. 420; Fletcher v. State, 49 Ind. 124; State v. Bassa, 69 Conn. 335; Culver v. People, 43 N. E. (Ill.) 812. (5) The Act of 1911 repealing Sec. 2029, R. S. 1909, and enacting a new section in lieu thereof, did not change the law governing the settling, signing, sealing and filing of bills of exceptions in criminal cases. Sec. 5245, R. S. 1909, does not provide that bills of exceptions shall be settled, signed, sealed and filed as may be allowed by law in civil cases, nor does it provide that such bills shall be settled, etc., as now or hereafter allowed by law in civil cases, but emphatically, positively and unequivocally declares "as now allowed by law in civil

actions," etc. The Legislature that passed the Act of 1911 was only dealing with the subject of bills of exceptions in civil actions. The act does not purport to be dealing with the matter of bills of exceptions in criminal cases, although it could well have been made to apply to criminal cases had the Legislature intended or desired that it should do so. St. Louis v. Gunning. 138 Mo. 352; Gaston v. Lamkin, 115 Mo. 32.

BROWN, P. J.—Charged with murder and convicted of manslaughter, defendant appeals from a judgment of the circuit court of Dunklin county fixing his punishment at two years in the penitentiary.

Defendant shot and killed one A. J. Lovins at a farm occupied by Thomas Walls, in Dunklin county, on Sunday, June 23, 1912. The circumstances surrounding and leading up to this tragedy were as follows:

In the early part of the year 1912, the defendant was hired to Thomas Walls as a farm hand. The family of Walls consisted of his wife, stepdaughter and three sons, Elmer, Jack and Tommie, all grown, or nearly grown. Thomas Walls will hereafter be referred to as Walls, Sr.

A courtship sprang up between defendant and the stepdaughter of Walls, Sr., which resulted in their marriage about six weeks before the tragedy. Walls, Sr., was very much displeased at the marriage, and, on account of the fact that they were not welcome at the Walls home, defendant and his wife went to board with one T. A. Blankenship, who resided some two hundred yards from the Walls home. After the departure of defendant from the home of Walls, Sr., one A. J. Lovins (sometimes referred to in this opinion as "Bub") was employed to take his place as a farm hand.

On the day of the tragedy one Dora Stevens paid a visit to the Walls family. She is a niece of Walls,

Sr., and was at that time engaged to marry Lovins, the hired hand. In going to town to meet her, Walls, Sr., Elmer Walls and Lovins, each procured a quart of whiskey, of which Lovins and Walls, Sr., partook quite freely. During the day defendant and his wife came along the road by the home of Walls, Sr., and he invited them into his house. This was the first time Walls, Sr., had shown a disposition to be friendly with them since their marriage. They accepted the invitation and remained there until quite late in the afternoon.

Walls, Sr., Lovins and defendant took several drinks of whiskey together during the day, and when night drew near Walls, Sr., and Lovins were quite drunk, and defendant was partially drunk. At one time during the afternoon Walls, Sr., proposed to defendant and Lovins that they kiss all the women present. Walls, Sr., did kiss defendant's wife (his stepdaughter), and defendant kissed Dora Stevens; but if this incident caused any friction or ill will between the parties it does not appear in the evidence.

Defendant and his wife returned to Blankenship's (where they were boarding). After their departure Walls, Sr., and Lovins decided to attend a church service which was being conducted near-by. Dora Stevens, believing that if they attended church in their then drunken condition they would get into trouble, tried to dissuade them from going, but failing in that effort she sent Jack Walls to request defendant to come back to the Walls home and help keep the drunken men away from church. She testified that she thought defendant could exert a greater influence over Walls, Sr., and Lovins than anyone else.

Pursuant to this request, defendant placed a revolver in his pocket and returned to the Walls home. On arriving there he found Walls, Sr., very angry over the alleged fact that somebody had stolen his whiskey. Defendant asked Lovins and Elmer Walls

who took the old man's whiskey, whereupon Lovins replied: "You would not accuse me of stealing it, would you?" Defendant replied: "Some of you took it, and if you will give it to him, or give him a drink, he will get quiet." This remark seemed to anger Lovins very much and he immediately began swearing and threatening to whip defendant unless he "took it back." Up to this point there was no conflict in the evidence. Some of the State's witnesses testified that Lovins struck defendant on the back with his hand and stated that defendant or he (Lovins) would get a whipping unless defendant took back what he had said. Defendant became angry and, drawing his revolver, threatened to shoot Lovins. Lovins continued to swear and make a disturbance, whereupon defendant proposed to one of the Walls boys that they procure clubs and beat Lovins to death. Lovins, according to the State's evidence, kept on quarrelling, swearing and challenging defendant to fight, until defendant shot him twice, the second shot producing almost instant death. The State's evidence further tends to prove that Lovins was entirely unarmed, and was only seeking a fist fight or ordinary battery with defendant.

After the shooting defendant walked to the home of Blankenship, two hundred yards away, put up the revolver and took down a shotgun and loaded it, and, on being asked by Blankenship what he was going to do replied: "Go back and kill every d—d one of them." Blankenship took the gun away from defendant, and he then remained at Blankenship's until arrested some hours later. On the part of the defendant there was slight evidence of a secret plan between Walls, Sr., and Lovins to assault defendant.

Within a few minutes after Lovins was killed, Walls, Sr., was heard to say that defendant would be sent to the penitentiary for fifteen or twenty years,

and that he would "get shet" of him for that length of time at least.

Defendant, testifying in his own behalf, stated that it was almost dark when Jack Walls came to Blankenship's and told him that Walls, Sr., and Lovins were angry, and that Dora Stevens and Mrs. Walls wanted him to come down to the Walls home; that they thought he (defendant) could do more with them than anyone else. Defendant promised to go down there in about fifteen minutes. Before starting down to Walls' a "curious feeling" came over him and he armed himself with a revolver. That Walls, Sr., had made threats against him and that he "had no reason to know but what he meant it." That on his arrival at the Walls home he inquired of Mrs. Walls what she wanted with him. She replied that she did not want anything, and that if she had known that he was coming she would have told him not to come, but she did not inform him that there was any danger at hand.

He further testified that he told Lovins and Elmer Walls to get Mr. Walls's whiskey and give him some and he would be all right, whereupon Lovins pulled off his coat and started toward defendant, but was stopped by Tommie Walls. Walls, Sr., hearing the loud talking, came out of the house and inquired about the trouble. Tommie Walls replied: "Nothing, only Bud (meaning Lovins) is out here cutting up." Walls, Sr., then remarked that he would see "that no one run over Bud."

Defendant told Walls, Sr., that it was "all settled," whereupon he (Walls, Sr.) went off in the direction Lovins had gone. That Mrs. Walls again suggested that defendant go home, and he had walked to the edge of the porch when Walls, Sr., and Lovins again came on the scene. Walls, Sr., seized defendant and pushed him off the porch, and pulled him around facing Lovins, saying at the time: "That has to be settled." That Lovins cursed defendant and said:

"You have got to take it back." That Walls, Sr., slapped Lovins on the back and said: "I will stay with you."

Defendant stated that it was growing dark and he walked back ten or twelve steps to keep out of the way of Lovins, Walls, Sr., and Elmer Walls, all three of whom pursued him; that he would have run but could not on account of a stove and wood pile which were behind him. That he then drew his revolver and warned them two or three times to stop. That Walls, Sr., and his son, Elmer Walls, fell back, but Lovins kept coming on with what appeared to be a knife in his hand and grabbing at defendant's pistol. He (defendant) then fired the fatal shot, believing that it was necessary to do so to save his life. After the shooting defendant started home and some one called to him to stop. He looked back and saw Walls, Sr., come out on the porch of his house with a shotgun in his hands.

I. The Attorney-General alleges that defendant's bill of exceptions is void and **Bill of Exceptions.** cannot be considered for the reason that it was filed out of time.

Defendant was convicted on December 9, 1912, and granted an appeal on the same day. The court gave him time until April, 1913, within which to file his bill of exceptions. The bill of exceptions was not filed during the time granted by the court, but on August 2, 1913, after the term during which the appeal was granted had lapsed, and after the time allowed and granted by the trial court had expired, the bill of exceptions was settled, signed by the trial judge, and filed. Under the foregoing facts was it filed within the time allowed by law?

Appellant contends that, under the Laws of 1911, p. 139, this bill was filed in a timely manner and must be considered, while the Attorney-General insists that this appeal being in a *criminal case* is not governed

by the amendment of 1911, and that its legality must be determined by section 5245, Revised Statutes 1909. His contention is that appeals in criminal cases are in no way affected by the amendment of section 2029, Revised Statutes 1909, for the reason that said section 2029 applies only to appeals in civil cases.

Said section 5245, supra, regulating the procedure for appeals in criminal cases, reads as follows:

"On the trial of any indictment or prosecution for a criminal offense, exceptions to any decisions of the court may be made in the same cases and manner provided by law in all civil cases; and bills of exceptions shall be settled, signed, sealed and filed as *now* allowed by law in civil actions, and the same proceedings may be had to compel or procure the signing and sealing of such bills, and the return thereof, as in civil cases."

This section is what is generally termed a reference statute; that is, it does not itself designate or set out in detail the steps necessary to secure a bill of exceptions in a criminal case, but refers or points to the Code of Civil Procedure and engrafts itself upon said code as a part and parcel thereof.

When a reference statute specifically designates the section or article of the statute of which it is made a part, such reference statute will not be changed or modified by any subsequent change in the statute to which it refers. It has even been held that the provisions of a repealed law may be referred to and thus become a part of a new statute. [2 Lewis' Sutherland's Statutory Construction (2 Ed.), p. 789.] But where the reference statute pertains only to a method of procedure and refers generally to some statute which defines how certain things may be done, such reference statute will be expanded, modified or changed every time the statute referred to is changed by the Legislature. [Gaston v. Lamkin, 115 Mo. l. c. 33.]

The gist of the Honorable Attorney-General's contention is that, because section 5245, supra, provides that bills of exceptions in criminal cases "shall be settled, signed, sealed and filed as *now* allowed by law in civil actions," the Act of 1911 amending section 2029, supra, is inoperative as to appeals in criminal cases, and that no valid bill can be filed in a criminal case after the time allowed by the trial judge for filing same has expired. He even contended, *ore tenus,* that, as said section 5245 was originally enacted at a time when the law required bills of exceptions in civil cases to be filed during the same term at which such cases were tried,.it is impossible to secure a valid bill of exceptions in a criminal case after the end of the term at which the judgment was rendered.

The phraseology of section 5245, supra, furnishes some color for the Attorney-General's insistence, but we find that the construction he contends for is entirely too narrow.

Section 5245, supra, does not refer to or become a part of any particular section of any statute, but refers generally to those provisions of the Code of Civil Procedure. regulating appeals, of which there are several sections; consequently, when the civil code was amended in 1911 so as to permit the filing of bills of exceptions after the time would expire within which the court might require such bills to be filed, section 5245, supra, underwent the same amendment, and bills of exceptions may be filed in criminal cases within the same time and under the same terms and conditions as in civil cases.

The bill of exceptions in this case was neither filed during the term at which defendant was convicted, nor within the time granted by the trial court, but was filed within the time permitted by Laws of 1911, p. 139, as construed by this court in the case of Craig v. St. Louis & San Francisco Railroad Co., 248 Mo. 270.

The learned Attorney-General's contention that said bill of exceptions was filed out of time must be disregarded.

II. For reversal defendant alleges that the trial court erred in admitting and refusing to strike out the evidence of T. A. Blankenship and Nora Hardy to the effect that after defendant returned home, and within a few minutes after the shooting, he took down a shotgun, loaded it, and on being asked what he was going to do, stated that he would "go back and kill every d—d one of them." It is contended that what defendant said to Blankenship and Nora Hardy was not part of the *res gestae.*

**Res Gestae.**

Wharton in the tenth edition of his work on Criminal Evidence, vol. 1, at pages 501-2, announces the rule that when "there is an unexpected collision between the men, entire strangers to each other, then the *res gestae* of the collision is confined to the few moments that it occupies. But in case of feuds and riots and strikes or disturbances, where parties are arrayed against each other for weeks, and people are so absorbed in the collision as to be conscious of little else, then all that such parties say and do under such circumstances is as much a part of the *res gestae* as the blows given in the homicides, for which particular prosecutions may be brought."

The same author at page 1747 of the second volume of said treatise says that it is permissible for the prosecution to introduce evidence "to show that accused told deceased's sister immediately following the homicide, that if 'you do not hold your mouth, I will blow your brains out,' . . . or to show that immediately after the homicide, accused fired at two persons with whom deceased had been walking; or to show other circumstances that establish a knowledge of the crime, or show malice toward the deceased, or indifference to the fact of the crime."

The doctrine announced by Wharton is strongly supported by the decision of this court in the case of State v. Bailey, 190 Mo. 257. After Bailey had assisted in murdering a nonunion hack driver he was admonished that "the union hack drivers could never expect to win a strike by shooting people," and replied: "That was the only way to win, and they all ought to be killed." It was held that this statement made by Bailey the next day after the killing was competent to establish his felonious intent and motive in assaulting the man who was killed. [Fitts v. State, 102 Tenn. l. c. 146.]

In the present case the defendant admits that he shot and killed deceased, so there is no issue as to the identity of the person who committed the crime (if one was committed). Testimony for the State strongly tends to prove that deceased was entirely unarmed; consequently, the motives and mental condition of defendant when he fired the fatal shot are very important. If the acts of deceased frightened defendant and gave him reasonable cause to believe that his life was in danger, then he may be entitled to an acquittal on that ground. On the other hand, if defendant shot deceased through a spirit of malice, or to obtain revenge, at a time when he was in no real or apparent danger from said deceased, then he is guilty.

The alleged remarks of defendant in the presence of witnesses Blankenship and Hardy indicated a feeling of intense malice against the whole Walls family, and as they were the friends and immediate associates of deceased, the jury might properly infer that the shooting of Lovins was the product of malice or a desire for revenge upon the part of said defendant.

If the testimony of Blankenship and Hardy is true, then defendant was only prevented from killing other members of the Walls family by the timely act of Blankenship in taking the shotgun from him. The cases of State v. McKenzie, 228 Mo. 385, and State v.

Porter, 213 Mo. 43, cited by appellant, are not in point, because they relate to self-serving statements made by accused persons after they had had time to formulate statements which would tend to exonerate them.

We hold that the remarks of defendant, testified to by witnesses Blankenship and Hardy, made so soon after the homicide and before anything had occurred which could be reasonably calculated to interrupt or change the condition of defendant's mind, are part of the *res gestae.* Consequently, the evidence of Blankenship and Hardy was properly admitted.

III. The defendant also complains of instruction "A" given by the court on its **Instruction:** own motion, on the ground that said **Comment on** **Evidence.** instruction is an unwarranted comment on certain evidence in the case. Said instruction reads as follows:

"The court instructs the jury that anything defendant may have said after shooting deceased, A. J. Lovins, if anything, to the effect that defendant had a notion to take a shotgun and go back down there and kill the whole d—d outfit, or words to that effect, is competent and admitted only for the purpose of showing the condition of mind of the defendant at that time; and whether or not it has any weight in showing the condition of his mind at the time of the shooting is a question of fact for you to determine."

We find that defendant's objection to this instruction is well taken. The evidence regarding defendant's expressed desire to kill the whole Walls family tended to prove that the defendant killed Lovins to gratify a desire for revenge, rather than through fear of injury to himself, and, for the reasons explained in a preceding paragraph, was properly admitted.

But, notwithstanding the evidence was competent and strongly pointed to defendant's guilt, the court was not justified in calling special attention to

it in an instruction, thereby giving it more prominence than other evidence in the case.

There are certain well-defined classes of evidence, such for instance, as evidence of recent possession of stolen goods, evidence of former conviction of crime, and evidence of an accomplice, which may properly be commented upon and the legal effect thereof explained by trial courts in their instructions to juries, but not only our statute (Sec. 5244, R. S. 1909), but many rulings of this court forbid trial courts from singling out other evidence and telling the jury that it is competent and that it is admitted for a specific purpose.

For instance, it would have been highly improper and unfair to the State for the court in this case to have told the jury that evidence tending to prove that defendant did not voluntarily go to the Walls home, but was invited there by Walls, Sr., or a member of his family, was competent and admitted to prove that he went there on a peaceful mission and not with the intention of shooting deceased.

For this same reason it was unfair to the defendant to specifically call the attention of the jury to the evidence tending to prove that very shortly after the killing, and after he was out of danger, he (defendant) entertained a murderous design upon the whole Walls family, where Lovins had been stopping, and who, by the evidence, appeared to be his associates and friends.

Where, as in this case, the evidence is very conflicting, and the trial court singles out and specifically comments upon some of such evidence, the jury are liable to place undue significance upon the evidence thus singled out, because the court has directed their attention to it. The jury should be allowed to weigh all evidence which is admitted and not stricken out by the court, and, with the aid of the argument, to form their own conclusions of what it proves or tends to prove. This doctrine is supported by the following authorities: State v. Rutherford, 152 Mo. 124; l. c.

133; State v. Reed, 137 Mo. l. c. 138; State v. Hibler, 149 Mo. 478; State v. Mitchell, 229 Mo. 683, and State v. Holmes, 239 Mo. 469.

IV.   The defendant also complains of instruction numbered 6, given by the court on behalf of the State, as follows:

"You are further instructed upon this matter of self-defense that a danger existing only in the imagination of the defendant will not excuse or justify the killing of Lovins, there must have been the apparent danger, affording a reasonable ground for an apprehension on the part of the defendant, that unless he killed or disabled Lovins, his own life or limbs were in imminent danger, whether the appearances of danger to the accused were such as to afford such reasonable ground of apprehension is a question for the jury.

**Self-defense: Right of Attack.**

"*The law of self-defense does not imply the right of attack,* nor does it permit of acts done in retaliation or for revenge, therefore, if you believe from the evidence that the defendant shot and killed said Lovins at a time when defendant had, because of the acts of the deceased, no reasonable cause to apprehend the approach of immediate danger to himself, and did so in the heat of passion or from a spirit of an utter disregard for human life, or for the purpose of gratifying spite or ill will toward Lovins, then the defendant cannot avail himself of the law on self-defense and you cannot acquit him on that ground."

It is asserted that this instruction is erroneous, in that it tells the jury that the "law of self-defense does not imply the right of attack," citing State v. Matthews, 148 Mo. 185. This last-mentioned instruction seems to be slightly argumentative and we think it would be less objectionable if the italicized words had been omitted, but whether the giving of it in the form

in which it was given would constitute reversible error, we do not decide.

V.   Defendant complains that the trial court approved the action of the prosecuting attorney in making the following remarks to the jury:

**Remarks of Counsel.**   "Men, it would be a disgrace for you to acquit the defendant under the testimony."

We are unable to agree with the defendant on this point.   If the prosecutor believed that a crime was clearly proven, he had the right to tell the jury, as a matter of argument, that he believed that it would be a disgrace for them to acquit the defendant.

For the error of the trial court in giving instruction numbered "A" of its own motion, which commented upon the evidence in an unwarranted manner, we reverse the judgment and remand the cause for new trial.

*Faris, J.,* concurs in result and in all of opinion except paragraphs 2 and 5.   *Walker, J.,* concurs in all of opinion except paragraph 3 and dissents from the result announced.